MARGARET E. JOHNSON MALMSTEDT, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Malmstedt v. Commissioner
Docket Nos. 4647-71, 4648-71, 4649-71
United States Tax Court
T.C. Memo 1976-46; 1976 Tax Ct. Memo LEXIS 357; 35 T.C.M. (CCH) 199; T.C.M. (RIA) 760046; February 24, 1976, Filed Sylman I. Euzent, for the petitioners. Charles B. Norris and Thomas C. Morrison, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Sec. 6651(a) Dkt. No.
Taxpayer
Year
Deficiency
Addition
4647-71
Margaret E. Johnson
1964
$19,384.33
$4,693.78
Malmstedt
1965
5,842.47
1966
699.07
4648-71
Tuscarora Realty,
1966 [2]
397.82
39.78
Inc.
4649-71
Bertil Malmstedt
1963
20,293.79
5,073.45
1965
17.50
1966
2,795.98
*361 Certain concessions having been made by the parties, the following issues remain for our decision: (1) whether, in 1962, Bertil Malmstedt and Margaret Johnson Malmstedt did in fact sell the Gold Mine property to their controlled corporation, Torpet Enterprises, Inc.; (2) whether respondent properly capitalized expenditures incurred by Bertil Malmstedt and Margaret E. Johnson Malmstedt during the years 1960 through 1963 in connection with the development of the Gold Mine property; (3) whether petitioners Bertil Malmstedt and Margaret E. Johnson Malmstedt are entitled to any net operating loss deductions as a result of the Gold Mine enterprise; (4) whether the gain realized from the 1964 foreclosure sale of the Gold Mine property must be recognized in 1964 or 1965; (5) whether the proceeds received from the foreclosure sale, which were applied to the payment of interest, taxes, and expenses of the sale, are deductible; (6) whether certain income attributable to real estate transactions is includable in the gross income of Margaret E. Johnson Malmstedt rather than the gross income of her corporation, *362 Margaret E. Johnson Associates, Inc.; (7) whether petitioners Bertil Malmstedt and Margaret E. Johnson Malmstedt are entitled to deductions based on the worthlessness of their stock in Torpet Construction Company, Inc.; (8) whether petitioners Bertil Malmstedt and Margaret E. Johnson Malmstedt received compensation in kind through the use of a truck owned by Tuscarora Realty, Inc. during the years 1965 and 1966; (9) whether petitioners Bertil Malmstedt and Margaret E. Johnson Malmstedt are entitled to file joint federal income tax returns for the calendar years 1965 and 1966 after having initially filed separate returns for those years; and (10) whether petitioner Tuscarora Realty, Inc. is entitled to a deduction for travel expenditures incurred in connection with the inspection of property it was to list for sale. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner Margaret E. Johnson Malmstedt (hereinafter Johnson or petitioner) resided in Berkeley Springs, West Virginia at the time she filed her petition herein. Johnson *363 filed her federal income tax returns for the calendar years 1964, 1965 and 1966 with the district director of internal revenue, Parkersburg, West Virginia. Her 1964 income tax return was not timely filed. Petitioner Bertil Malmstedt (hereinafter referred to as Malmstedt or petitioner) resided in Berkeley Springs, West Virginia at the time he filed his petition herein. He filed his federal income tax returns for the calendar years 1963, 1965 and 1966 with the district director of internal revenue, Parkersburg, West Virginia. His 1963 tax return was untimely. Petitioner Tuscarora Realty, Inc. (hereinafter Tuscarora) is a West Virginia corporation having its principal office in Berkeley Springs, West Virginia. Its corporate income tax return for its fiscal year ended July 31, 1966 was filed with the district director of internal revenue, Parkersburg, West Virginia. This return was not timely filed. During the period 1945 through 1950, Johnson was employed by a construction firm in the capacity of bookkeeper and became acquainted with the firm's construction manager who imparted to her various facets of the construction business. Subsequently she became a real estate agent and through *364 such activities financed her education at a school of pharmacy. In either 1956 or 1957 Johnson opened the Potomac Village Pharmacy but continued her practice as a real estate agent. Malmstedt engaged in real estate development and building ventures from 1937 until his retirement in 1963. During the late 1950's, at which time he and Johnson became acquainted, he was transacting his business through a sole proprietorship, Torpet Construction Company (hereinafter Construction). Initially, Johnson acted in the capacity of realtor in conjunction with Construction's land acquisitions. In 1958, however, the relationship was altered when, in connection with the acquisition and development of the Beam Court project, Johnson became a partner in Construction. [3]
In 1958, Construction embarked upon the Beam Court project which was completed in 1959. The project involved two acres upon which several homes were constructed and several more renovated. Although Johnson was still active as a pharmacist, she scheduled her working hours in a manner that enabled her to devote approximately 8 hours per day to the project. *365 The next project undertaken by Construction was the development of da da Woods, a tract of land comprising approximately 30 acres. Only four homes were constructed thereon, the balance of the land being subsequently sold. During the term of the da da Woods enterprise, Malmstedt and Johnson decided that Construction should be incorporated to formalize their operating (partnership) arrangement and to limit their respective liabilities. Accordingly, in July, 1960, the assets of Construction were transferred to Torpet Construction Company, Inc. (hereinafter referred to as Construction, Inc.), the stock of which was issued in March, 1961. From March, 1961 until November, 1963, the issued and outstanding stock of Construction, Inc. was held as follows: No. of Shares
Johnson (individually)
3,800
Malmstedt (individually)
3,800
Johnson & Malmstedt (as joint tenants)
3,800
11,400 At the time the stock was issued, Johnson's basis in her shares was $81,750.20. Malmstedt's basis in his stock was $35,154.35. [4] The stock of Construction, Inc. became worthless in 1964. *366 Subsequent to the conclusion of the da da Woods project Johnson and Malmstedt embarked upon the development of a tract of land known as Potomac Ranch. This development, operated through the corporate vehicle, Torpet Properties Inc. [5] (hereinafter Properties), comprised approximately 118 acres of land. Properties, however, utilized but 10 acres in the construction of only 4 houses, the remaining land being lost in a foreclosure sale in 1963 or 1964. On November 12, 1959, Construction entered into a contract for the purchase of certain property (hereinafter referred to as Gold Mine) from Swanson Associates, Inc. (hereinafter Swanson) for a consideration of $1,000,000. In January, 1960 Gold Mine was sold for $970,000 to Malmstedt and Johnson. [6] For the sole purpose of obtaining the necessary financing, petitioners structured the transaction as follows: On January 29, 1960 Swanson executed a deed to Properties, the nominal purchaser, and the following day Properties deeded Gold Mine to Malmstedt and Johnson as tenants in common. Both deeds were recorded on February 4, 1960. To finance the acquisition $350,000 was borrowed *367 from the Washington Mortgage and Development Company, and Properties executed a note to Swanson in the amount of $750,000, bearing interest at a rate of 6 percent, [7] and a deed of trust in connection therewith. Petitioners purchased Gold Mine for the purpose of constructing a grand-scale international hotel thereon. It was their intention to erect the hotel and lease it to an experienced hotel operator. However, various problems emerged as obstacles on their path to success, including the following: (1) obtaining a zoning change for Gold Mine; (2) providing Gold Mine with the necessary sewage facilities; and (3) locating a reputable hotel operator willing to enter into a lease which provided for a guaranteed rental of $1,000,000 per annum, which was the minimum guarantee *368 required by petitioners to obtain backing for the venture. To facilitate the hurdling of these obstacles, petitioners leased and furnished an office in Potomac, Maryland under the name of Torpet Enterprises, Inc. (hereinafter Enterprises), the corporation they planned to utilize as a vehicle for their operations in conjunction with the Gold Mine project. [8] They subsequently expended considerable sums of money in an effort to overcome the aforenoted difficulties. Such sums included expenditures for the following: (1) attorney's fees in connection with the zoning change application; (2) preparation of a financial statement of Enterprises; (3) preparation of a tax revenue study relative to Gold Mine; (4) preparation of an economic analysis and market study of Gold Mine; (5) preparation of a brochure illustrating the intended use of Gold Mine; and (6) attempts through an agent, Redvers Opie, to obtain a lessee for Gold Mine. The expenditures were incurred at various times during the period 1960 through 1964. *369 On June 30, 1961 Johnson and Malmstedt contracted to sell Gold Mine to Enterprises. The sales price, $7,000,000, [9] consisted of the following: Enterprises was to assume the first mortgage and deed of trust in the amount of $350,000 [10] and the second deed of trust in the amount of $750,000. [11] Enterprises was also to execute a note to the sellers in the amount of $5,900,000 to be paid in monthly installments commencing January, 1965. On June 15, 1962 petitioners and Enterprises executed an extension of the aforementioned contract for sale until June 30, 1963. A second extension (until June 30, 1964) was executed on June 28, 1963. The sale, however, was never consummated. Nevertheless, Gold Mine was listed as an asset of Enterprises on its financial statement. *370 On their partnership return for the calendar year 1962 Malmstedt and Johnson erroneously reported as income (on the installment method) the "gain" from the alleged sale to Enterprises, computing the gain recognized as $365,889.87, [12] and also reported an ordinary loss of $179,889.03 attributable to the Gold Mine project. On their respective individual income tax returns for 1962 Johnson and Malmstedt each reported their ratable shares (50 percent for each) of the aforementioned gains and losses. However, their 1963 partnership return [13] stated that the sale to Enterprises was never consummated and respondent in his determination of gain realized (and recognized) from the foreclosure sales ignored the 1962 "sale" in his computations. *371 In early 1962, petitioners found it necessary to refinance the Gold Mine venture. In order to circumvent the usury statutes of the State of Maryland, on January 17, 1962 petitioners transferred Gold Mine to Properties which redeeded it to petitioners as tenants in common the following day. On January 18, 1962 Properties executed a note in the principal amount of $775,000 carrying interest at the rate of 5 percent per annum. [14] This note was secured by a deed of trust recorded on the same day, and on February 16, 1962 an agreement was recorded which subordinated the earlier deed of trust securing the earlier $750,000 loan to this deed of trust. In late 1963, Samuel Thomas instituted foreclosure proceedings on Gold Mine. The foreclosure sale was held on November 21, 1963, the highest bidder being Johnson who deposited $25,000 of her bid of $1,625,000. However, Johnson failed to make settlement and pursuant to an order of the Circuit Court for Montgomery County, State of Maryland a second foreclosure sale was held on March 30, 1964. At the latter *372 sale, ratified in December, 1964, the purchaser was Samuel Thomas who bid $1,600,000 for Gold Mine. The application of the proceeds of the sale (including Johnson's forfeited deposit) is set forth in the trustees' report which follows: I. TO AMOUNT OF SALE
Sale Price
$1,600,000.00
First sale to Margaret Johnson,
deposit, a forfeiture declared
by Trustees
$ 25,000.00
$1,625,000.00
II. TO ADJUSTMENT OF TAXES
State & County taxes, Parcel #1,
as shown by copy of receipted tax
bill filed as voucher, attached to
this audit, levy of 1963, $16,441.57
from 7/1/63 to 3/30/64, payable by
the Trustee
$ 12,331.48
From date of sale 3/30/64 to
6/30/64 payable by purchaser,
Samuel F. Thomas
$ 4,110.09
Interest payable by Trustee
$ 739.87
Advertising cost
$ 15.00
State & County taxes, Parcel
$ 1,066.92
#2 as shown by copy of receipted
tax bill filed as voucher,
attached to this audit, Levy
1963, $1,422.57 from 7/1/63
to 3/30/64, payable by trustee
From Date of sale 3/30/64 to
6/30/64 payable by purchaser
$ 355.65
Interest payable by trustee
$ 64.02
Advertising cost
$ 15.00
III. BY COSTS & EXPENSES OF SALE
Court costs
Clerk, Montgomery County
$ 44.00
Circuit Court
Auditor's Fee
T. Robert Romero, Auditor
$ 145.00
Solicitor's Fee
None requested
Auctioneer's Fee
Thomas J. Owens
1st Sale
$ 500.00
2nd Sale
$ 500.00
Trustee's Commission
E. Austin Carlin and
$ 40,000.00
Robert L. Ackerly, 5% of sale
provided in deed of trust, but
Auditor advised to allow lesser
amount by Trustees, pursuant to
agreement
Bond Premium
R. F. Green
$ 5,512.00
Publication
Bethesda-Chevy Chase
Tribune
Notice of Sale: 1st
advertisement of sale;
cancelled
$ 140.00
1st sale
$ 616.00
2nd sale
$ 462.00
Order Nisi - Sale
1st sale
$ 30.00
2nd sale
$ 30.00
Advertising & Notices of Sale
Maryland News
$ 60.00
Decatur Press: Handbills
$ 31.42
Handbills
$ 34.76
Evening Star
$ 178.02
Evening Star
$ 252.54
Robert Maddox
$ 100.00
IV. BY PAYMENT OF BALANCE OF PROCEEDS
OF SALE TO Samuel F. Thomas, holder
of note for credit on the debt secured
by Deed of Trust foreclosed, recorded
in Liber 2929, folio 526
Unpaid Principal
$775,000.00
Interest thereon at 5%
per annum from 1/18/62 to 10/18/64
$111,478.89
V. BY PAYMENT OF BALANCE OF PROCEEDS
OF SALE TO Samuel F. Thomas, holder
of Deed of Trust note for credit on
the debt secured by the Deed of Trust
recorded among the Land Records of
Montgomery County in Liber 2701,
folio 552
Unpaid Principal, no interest
$750,000.00
computed as insufficient amount
available to pay
Less Deficiency (no
interest included) [15]
$ 69,881.18
$680,118.82
*373 Neither Malmstedt nor Johnson reported any item of income, loss, or deduction resulting from the aforetold foreclosure events on either of their individual returns for 1963 or 1964 or on their partnership returns for those years. Respondent, however, in his notices of deficiency made the following determinations: (1) that Bertil Malmstedt realized a long-term capital gain of $104,184.51 from the disposition of Gold Mine in 1963, computed as follows: Mortgage assumed
$1,525,000.00
Basis
1,316,630.98
Long-term capital gain
$ 208,369.02
of the partnership
Malmstedt's 50% share
104,184.51 (2) that Johnson realized a long-term capital gain of $115,998.89 from the disposition of Gold Mine in 1964, computed as follows: Bid at foreclosure
$1,600,000.00
Less: Basis of
$1,420,815.49
Property
Expenses of sale
317.59
Adjustment of
62,868.03
1,484,001.11
taxes and expenses
Long-term capital gain
$ 115,998.89 (3) that Johnson incurred $37,131.97 of deductible expenses *374 in connection with the foreclosure sale in 1964; (4) that the deposit of $25,000 which Johnson forfeited in connection with the foreclosure proceedings was nondeductible. [16]
In late 1963 Malmstedt desired to abandon the Gold Mine project. Since Johnson retained her interest in pursuing the endeavor Malmstedt endorsed his stock in Construction, Inc. to her on November 22, 1963. The transfer, which was gratuitous, was witnessed by Nancy Barton who signed the stock certificates as an attesting witness in 1963. Margaret E. Johnson, Associates Inc. (hereinafter Associates), a Maryland corporation, was incorporated in either 1964 or 1965 with all its stock (with the exception of two qualifying shares) being issued to Johnson who was also its sole employee. The principal business activity of Associates was dealings in real estate. Respondent determined that certain income earned in 1964 and 1965 was attributable to and taxable to Johnson rather than Associates which never filed corporate income tax returns. Johnson married Malmstedt in 1965. However, despite their newly attained marital status, Malmstedt *375 and Johnson filed separate federal income tax returns for the taxable years 1965 and 1966 and respondent in his notices of deficiency relative to those years made his determinations accordingly. During 1965 and 1966 petitioners resided in Berkeley Springs, West Virginia, making their home in a portion of an A-frame building. The remaining space in the A-frame housed the office of Tuscarora, the corporate entity through which petitioners were conducting their business transactions during these years. Neither Malmstedt nor Johnson owned an automobile, and used the truck owned by Tuscarora for transportation. Respondent determined that the use of the corporation's truck resulted in increases in the taxable incomes of both Malmstedt and Johnson for the years 1965 and 1966. In 1966, Malmstedt and Johnson traveled to Little Abaco, Bahamas to inspect real estate that they had been requested to list for sale. The trip was paid for by Tuscarora which deducted $500 in connection therewith on its corporate income tax return for its fiscal year ended July 31, 1966. Respondent, in his notice of deficiency, disallowed the deduction. OPINION Issue 1. The 1962 Sale
Both parties agree *376 that the foreclosure sale of Gold Mine was a taxable event but take divergent positions on the method to be used in determining petitioners' adjusted basis in Gold Mine for purposes of computing the gain (or loss) realized. Petitioners urge that the record supports the conclusion that they in fact sold Gold Mine in 1962 to Enterprises. They argue that their reacquisition of Gold Mine resulted in no gain (or loss) recognized and that their adjusted basis after the reacquisition was their adjusted basis prior to the 1962 sale, increased by the gain they recognized in 1962 pursuant to section 1038, I.R.C. 1954. [17] Respondent argues that no sale took place in 1962, that section 1038 has no application to the facts herein, and that petitioners' adjusted basis for the computation of gain or loss is their cost basis increased by any expenditures which are properly capitalized. We agree with respondent. Before proceeding to the substantive *377 issue before us one preliminary matter requires our attention. Since the inception of these proceedings petitioners have continually taken the position that, since the 1962 taxable year is a barred year under section 6501, one of two consequences must follow--either we are barred from now finding that no sale took place in 1962 or, if we are not so barred, respondent's burden on this issue is as great as that borne by Atlas. Petitioners' position is ill-taken. It is well settled that section 6214(b) does prevent this Court from determining an overpayment or underpayment for a year not in issue before us. However, we are not prevented from considering events that occurred in prior years when such consideration is necessary to determine properly the tax liability for the year in issue. Lone Manor Farms, Inc.,61 T.C. 436, 440 (1974), affirmed by Judgment Order (3d Cir., Jan. 27, 1975). From the evidence and arguments before us it is apparent that the pre-1963 events involving petitioners and Gold Mine are relevant to a determination of petitioners' proper tax liability for *378 the years that are in issue. Furthermore, petitioners in their petitions assert that respondent's determinations of deficiencies for 1963, 1964, 1965, and 1966 are erroneous because he failed to consider net operating loss carryovers available from prior years. In support petitioners assert this net operating loss carryover was created from the attempted development of Gold Mine by the joint venture which the petitioners controlled. With respect to this issue, respondent's desire is merely to compute petitioners' income for these prior years to determine the proper amount of the net operating loss carryover, if any, available for petitioners' benefit in the years in issue. We believe the authority for respondent to do this is clear. Section 6214(b); Lone Manor Farms, Inc.,supra61 T.C. at 440, ABKCO Industries, Inc.,56 T.C. 1083, 1088-89 (1971), affirmed on another issue 482 F. 2d 150 (3d Cir. 1973). Finally, the burden of proof on this issue falls not (as contended by petitioners) on respondent, but rather on petitioners themselves. Respondent has made determinations relative to the gains realized from the foreclosure proceedings *379 which disregard any sales in 1962. The burden of upsetting these determinations falls squarely on petitioners' shoulders. Welch v. Helvering,290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure.
Turning now to the substantive issue before us, we must decide whether or not petitioners did in fact sell Gold Mine to Enterprises in 1962. The evidence adduced at trial revealed that the following events transpired: on June 30, 1961 petitioners and Enterprises entered into a contract for the sale of Gold Mine; on June 15, 1962 a document was executed extending the time for settlement until June 30, 1962, and a further extension was executed on June 28, 1963; in December, 1962 a settlement sheet was prepared reflecting the sale at issue and petitioners reported the gain therefrom on their partnership and respective individual tax returns for 1962. However, petitioners' 1963 partnership return (filed in 1966) stated that their 1962 partnership return was erroneous in that no sale was consummated in 1962. Petitioners' position is that the settlement sheet and the appearance of Gold Mine on the financial sheet of Enterprises is determinative of the *380 issue before us. On brief they state their position as follows: The certified financial statement cannot be entirely disregarded, notwithstanding Respondent's desire so to do. It is common knowledge that a certified public accountant's certification on a statement is his stamp of recognizing and reporting to the world (for it certainly is to be anticipated that there is and can be no limitation on the distribution pattern of a certified financial statement) the facts and the validity of the facts set forth therein. There must therefore be acceptance of the fact that the CPA had seen a bona fide settlement sheet which he recognized as representing the occurrence of the transaction reported. Petitioners' contentions are both novel and without merit. The record, when viewed as a whole, supports but one conclusion--that Gold Mine was not sold in 1962. Apart from the fact that no deed transferring Gold Mine to Enterprises was proferred into evidence, we find it inexplicable that the June, 1963 extension would have been executed had the sale been actually consummated in 1962. Furthermore, petitioners concede that they owned (in their individual capacities) Gold Mine at the time *381 of the 1963 and 1964 foreclosure sales. This being so, we are puzzled by petitioners' inability to explain when, why, and on what terms Enterprises reconveyed Gold Mine to them. Finally, on their 1963 partnership return (filed in 1966) they unequivocally state that no sale was consummated in 1962. In view of the foregoing we find that in 1962 petitioners did not sell Gold Mine to Enterprises and that it is inappropriate to consider such alleged sale in the determination of petitioners' adjusted basis in Gold Mine. Issue 2. Capitalization of Gold Mine Expenditures
During the calendar years 1960 through 1963 the Malmstedt-Johnson joint venture expended considerable sums of money in an effort to turn their dream hotel into reality. It is respondent's position that these expenditures are entirely nondeductible capital expenses which must be added to petitioners' basis in Gold Mine. [18] Petitioners' assert in their petitions, and on brief, that they are entitled to deductions for these expenditures. *382 As a preliminary matter, we note that the portion of the record pertaining to this issue is rather muddy and the precise amount and breakdown of petitioners' expenses are somewhat unclear. In his computations respondent has capitalized a total of $528,664.19 but has failed to apprise us of the nature of any particular expense other than a $150,000 loan refinancing fee (from 1962), $179,889.03 in expenses claimed by petitioners on their 1962 partnership return and $21,379.32 deemed deductible for 1963 by respondent in his notice of deficiency in dkt No. 4649-71. [19] Although the gross deductions claimed on petitioners' partnership returns for the years 1960 through 1963 do not match the gross figure capitalized by respondent, petitioners offered no evidence as to their expenditures and on brief have not contested respondent's gross figure. Hence, we accept and find that petitioners expended $528,664.19 in the aborted development of Gold Mine. On the state of the record we are also compelled to accept the limited breakdown of the expenses at issue to the extent presented by respondent. *383 Petitioners did, however, in their petitions in the instant case, allege that they incurred the following expenditures (among others) during the years 1960 through 1963: Brochure and architect's fee
$11,940.67
Travel and entertainment
13,469.92
Legal fees
14,499.50
Total
$39,910.09 Our ultimate resolution of this issue compels us to regard these allegations as admissions and we accept these figures as a further breakdown of petitioners' total expenses. Thus, we find petitioners' 1960-1963 total Gold Mine expenditures to be: Loan refinancing fee
$150,000.00
Interest
183,614.11
Insurance
3,392.21
Real estate taxes
5,665.62
State stamps
6,847.50
Brochure & architect's fee
11,940.67
Travel and entertainment
15,218.83
Legal fees
14,499.50
Miscellaneous
137,485.75
Total
$528,664.19
We turn first to the expenditures for insurance, stamps, brochure and architectural studies, travel and entertainment, legal fees and miscellaneous expenses. Although the precise purpose of each such expenditure is not before us it is clear that all were incurred as part of the preliminary work which was to be a prelude to the envisioned international *384 hotel. It cannot be gainsaid, and petitioners in no way contest the fact, that the sole raison d'etre for these outlays was to establish the groundwork necessary to enable petitioners to attain their ultimate objective, the construction of an international hotel which they intended to lease to an experienced hotel operator. Obviously such expenditures were designed to improve and enhance Gold Mine's value and to procure for petitioners financial benefits over a lengthy period of time. We are inescapably left with the conclusion that they bear all the earmarks of a capital expenditure and that respondent's capitalization thereof is entirely proper. Commissioner v. Lincoln Savings and Loan Association,403 U.S. 345 (1971); Georator Corporation v. United States,485 F. 2d 283 (4th Cir. 1973), cert. denied 417 U.S. 945 (1974); Godfrey v. Commissioner,335 F. 2d 82 (6th Cir. 1964) affg. T.C. Memo. 1963-1, cert. denied 379 U.S. 966 (1965); Jackson E. Cagle, Jr.,63 T.C. 86 (1974), on appeal (5th Cir. March 6, 1975). The interest expense, however, must stand on a different *385 footing. Unlike the expenses we have just held to be capital in nature, interest does not represent a cost of acquiring or developing property. Rather it is the price paid for the use of borrowed money even when the loan proceeds are used to improve or secure a capital asset. Jackson E. Cagle, Jr.,supra,Anover Realty Corp.,33 T.C. 671 (1960). We hold that respondent's capitalization of the interest expense is improper and that such expense is deductible pursuant to section 163. See also Queensboro Corporation v. Commissioner,134 F. 2d 942 (2d Cir. 1943); section 1.266-1(d) ex. (4), Income Tax Regs. [20]
We also hold that the real estate taxes paid by petitioners as owners of Gold Mine are deductibe expenses pursuant to section 164 rather than capital outlays since they were incurred to discharge an annually recurring liability. *386 Cf. section 1.266-1(d) ex. (4), Income Tax Regs. Finally, we hold that respondent's capitalization of the $150,000 loan refinancing fee is improper. Regardless of how petitioners utilized the proceeds of the loan, the loan fee is the cost of obtaining the loan itself and must be amortized over the life of the loan. Anover Realty Corp.,supra at 675. Issue 3. Net Operating Loss Deduction
Petitioners assert in their petitions and on brief that they are entitled to net operating loss deductions based upon losses they incurred during the years 1960 through 1963 in connection with the Gold Mine project. Respondent takes the position that petitioners have failed to demonstrate any specific basis for net operating loss deductions on either their tax returns, pleadings, or on brief. He argues further, that petitioners' Gold Mine activities fail to rise to the level of a trade or business and are precluded from consideration in determining whether petitioners sustained any net operating losses by section 172(d)(4). We find considerable merit in both arguments advanced by respondent. *387 Put succinctly, respondent's initial argument is that petitioners have failed to overcome their burden of proof on this issue. We agree. Petitioners bear the burden of establishing their right to a net operating loss, including the amount. A. Raymond Jones,25 T.C. 1100 (1956), revd. on another issue, 259 F. 2d 300 (5th Cir. 1958). They have simply failed to demonstrate the amount of the loss for any particular year and the amount of taxable income for any year to which a loss could be carried. The only evidence offered, in this regard, was petitioners' tax returns for the calendar years 1959 through 1965, many of which are being contested herein by respondent. Such returns are insufficient to sustain petitioners' burden of proof. A. Raymond Jones,supra.
Moreover, we doubt whether there exists any net operating losses for petitioners to demonstrate. Their alleged losses are predicated upon the $528,664.19 of expenditures incurred to develop Gold Mine. However, we have held many of these expenditures to be nondeductible and as such they cannot enter *388 into the computation of a net-operating loss. Section 172(c). Furthermore, pursuant to section 172(d)(4)[21] deductions which are not attributable to a taxpayer's trade or business enter into the computation of a net operating loss only to the extent of the taxpayer's nonbusiness income. Thus, to avoid this limitation, the deductible interest and taxes must be attributable to either a trade or business of the partnership or the petitioners (in their individual capacities). A consideration of the record leads us to the conclusion that these expenses were not so attributable at the time they were incurred. At the outset, we acknowledge that petitioners were involved in the trade or business of real *389 estate development well prior to the commencement of the Gold Mine venture. However, their prior dealings involved residential development on a modest scale. By contrast the Gold Mine project was designed to culminate in petitioners' holding for rent an international hotel on a grand scale. To our mind, the vast qualitative differences between petitioners' earlier ventures and the Gold Mine venture would have rendered the Gold Mine a new trade or business, separate and distinct from petitioners' prior real estate enterprises had they succeeded in constructing and opening the hotel. Hence, we hold that the Gold Mine expenditures were not attributable to petitioners' preexisting real estate business. [22] See Radio Station WBIR, Inc.,31 T.C. 803 (1959). *390 We also find that the expenditures were not attributable to a trade or business involving Gold Mine. Admittedly, petitioners' activities in this regard were extensive and their profit motive is unquestioned. However, a precondition to our finding that an expenditure is attributable to a trade or business, is the existence of that trade or business at the time the expenditure is incurred. We feel the rationale of Frank B. Polachek,22 T.C. 858 (1954) compels the conclusion that no trade or business was ever engendered by petitioners' efforts to develop Gold Mine. In Polachek,supra, the taxpayer devoted considerable time in attempting to found an investment advisory service. He discussed his proposals extensively with associates, advertised for financial backing, solicited clients, and prepared specimens of his proposed services. In denying his claimed business deduction we said at page 863: We think that the petitioner's expenses cannot be deducted in 1947 under the authority of section 23(a)(1)(A). So far as it would be material here, that subsection permits the deduction of the ordinary and necessary expenses paid or incurred during the *391 taxable year in carrying on a trade or business. But the petitioner had no business in 1947. At the most, during the period now under consideration, he merely had plans for a potential business. His plans never materialized. George C. Westervelt,8 T.C. 1248, 1252; Morton Frank,20 T.C. 511. Regardless of the time he may have devoted to the project, or the expense in attempting to attract associates and capital and soliciting prospective clients, we think that petitioner's idea was still in its formative stages when it was finally abandoned. Similarly, petitioners were not in the hotel business during any of the years at issue, and like the taxpayer in Polachek,supra, their plans dissipated while still in the formative stages. See also Richmond Television Corporation v. United States,345 F. 2d 901 (4th Cir. 1965), remanded on another issue 382 U.S. 68 (1965). Werner Abegg,50 T.C. 145, 153 (1968), affd. 429 F. 2d 1209 (2d Cir. 1970), cert. denied 400 U.S. 1008 (1971). Since petitioners' deductions are nonbusiness deductions within the meaning of section *392 172(d) (4) and since they have failed to carry their burden of proof on this issue, their claim for a net operating loss deduction is denied. Issue 4. Year of Recognition of Foreclosure Gain
Petitioners maintain that any gain they realized from the 1964 foreclosure sale is recognizable in 1964. Respondent, in his notices of deficiency, originally took the position that although Johnson disposed of her interest and was liable for tax on the gain in 1964, Malmstedt had lost his interest in Gold Mine and incurred a tax liability therefrom in 1963 (as a result of Johnson's successful bid at the 1963 foreclosure sale). Respondent has now shifted his stance and agrees that any gain resulting from the foreclosure proceedings is taxable to Malmstedt and Johnson in the same year. On brief he contends that the proper year for recognition is 1965, and not 1964, stating: * * * In brief, both petitioners argue that they jointly realized foreclosure gains in 1964 as a result of the Court's ratification of the second foreclosure sale on 12-2-64. However, the Court's ratification of the sale did not resolve petitioners' ultimate liability. But for the 1965 Thomas release, the second foreclosure *393 sale would have resulted in losses to each petitioner. But because Thomas had been able to resell Gold Mine (7-2-64) to third parties for $1,725,000.00 or a quick $125,000.00 profit, JOHNSON protested. She filed exceptions to the auditor's report, seeking relief from proposed deficiencies on the partially unpaid 2d trust note. Eventually, in 1965, Thomas released both MALMSTEDT and JOHNSON in exchange for JOHNSON'S withdrawing her exceptions and consenting to the auditor's report (as then amended). Because of the above, the determinative events were stalled until 1965. Respondent respectfully requests this Court to determine the Gold Mine foreclosure episode resulted in the long term capital gains for 1965, as reflected in Appendix A. We reject respondent's argument for two reasons. First, the record is barren of evidence pertaining to the agreement between petitioners and Thomas referred to by respondent. Second, and more fundamentally, it is absolutely clear from the record that after 1964 petitioners retained absolutely no interest in Gold Mine. For that matter, neither did Samuel Thomas, who resold the property pursuant to the Maryland Court's order dated December 2, 1964. We *394 simply fail to see how the gain (or loss) from the 1964 foreclosure sale can be recognized in a taxable year other than 1964. Cf. Helvering v. Hammel,311 U.S. 504 (1941). Issue 5. Tax Treatment of Foreclosure Proceeds
We have set forth in our findings of fact the trustees' application of the proceeds from the foreclosure sale. The issue before us is the proper tax treatment flowing from the dispersals for interest, taxes and selling expenses. In his notice of deficiency in docket No. 4647-71 (to petitioner Johnson) respondent allowed as a deduction for the year 1964, $37,131.97 consisting of, "Interest paid resulting from excess bid over mortgages, assumed tax adjustment, and expenses of sale in foreclosure". [23] On brief, however, he plays a different tune contending that the foreclosure expenses are wholly nondeductible and must be employed as offsets to the foreclosure gain (or as increases to any losses). Petitioners' position is out of harmony with that stated in respondent's brief. They urge that the proceeds applied to the payment of interest, taxes, and selling expenses are deductible. We think both parties are, to some extent, out of key. *395 We deal first with the proceeds applied to the payment of interest. [24] We find the situation herein to be no different than had petitioners received the entire proceeds and proceeded to pay the accrued interest themselves. In either case they would be remitting sums to discharge a bona fide liability for the interest. Therefore, Johnson is entitled to a deduction in 1964 for 50 percent of the interest paid from the sales proceeds. [25]Harold M. Blossom,38 B.T.A. 1136 (1938). We also hold that the same rationale and result obtains with respect to the taxes (attributable to the sellers) paid from the sales proceeds. In so holding, we are aware that our decision in George Mogg,15 T.C. 133 (1950), reached a contrary result on similar facts. That decision, however, was grounded on a finding that once foreclosure had *396 occurred there was no longer a personal obligation on the taxpayer's part nor any encumbrance on any of his property for payment of the taxes. Absent such liability or encumbrance at the time of payment we held the payment to be nondeductible. The legal situation herein is distinguishable from Mogg. Under Maryland law had the accrued Gold Mine taxes remained unpaid, such obligation could have been subsequently satisfied should any other property of petitioners been lost in a tax sale, the sole limitation being that taxes directly attributable to the property being sold and obligations of general creditors would receive priority over state taxes not attributable to the property being sold. Thompson v. Henderson,155 Md. 665 (1928); Weiprecht v. Ripple,217 Md. 337 (1958). For this reason, we find Mogg to be distinguishable and hold that Johnson is entitled to deduct 50 percent of the taxes paid from the proceeds in her 1964 taxable year. We also hold that the remaining expenses are selling expenses. As such they are not deductible but must be utilized as offsets in the computation of gain or loss. Cf. Woodward v. Commissioner,397 U.S. 572 (1970). *397 Issue 6. Income from Real Estate Transactions
In his notice of deficiency in docket No. 4647-71 respondent increased the taxable income of Johnson as follows: EXPLANATION OF ITEMS
It is determined that you realized a net profit of $22,881.75 in 1964 from the operation of your real estate business in lieu of the loss shown on your return. Accordingly, your taxable income for 1964 is increased $26,381.75, as shown below. Business loss claimed as a deduction on return
$ 3,500.00 *
Net profit from business as corrected
22,881.75 * * *
Increase in taxable income
$26,381.75
* * *
It is determined that you realized a net profit of $20,876.66 in 1965 from the operation of your real estate business which was not reported on your original return. Accordingly, your taxable income for 1965 is increased $20,876.66. Net profit from business * * *
$20,876.66
Reported on original return
none
Increase in taxable income
$20,876.66
Petitioner, Johnson, contends that the income referred to in this determination is attributable to Associates and should not be included in her income for 1964 and 1965. The only evidence on this issue *398 is the testimony of Johnson that Associates was incorporated in 1964 or 1965, had only Johnson in its employ, was owned entirely by Johnson (with the exception of two qualifying shares), and never filed corporate income tax returns. Such testimony is insufficient to overcome the presumption of correctness carried by respondent's determination on this issue which is hereby sustained. Welch v. Helvering,290 U.S. 111 (1933); Dodd v. Commissioner,298 F. 2d 570 (4th Cir. 1962). Issue 7. Worthless Stock Deduction
Petitioners now claim entitlement to deductions for the worthlessness of their stock of Construction, Inc., Malmstedt asserting his claim for the calendar year 1963 (in which he gratuitously disposed of his stock interest), and Johnson's for the calendar year 1964 (based upon the 1964 foreclosure sale). Respondent contests these claims on the grounds that petitioners have failed to establish either their respective basis in the stock or the year in which the stock became worthless. In response to respondent's former argument, petitioners have established to our satisfaction, and we have found as a fact, that on the date of incorporation *399 Malmstedt and Johnson had a stock basis of $35,154.35 and $81,750.20, respectively. Hence, we reject this argument. Respondent's second argument regarding the year of worthlessness is more persuasive. We cannot accept petitioners' argument that the stock of Construction, Inc. became worthless in both 1963 and 1964. [26] This, however, does not preclude us from finding that the Construction, Inc. stock became worthless in either 1963 or 1964 and it is incumbent upon us to decide if the record supports such a conclusion. The standards for such a determination were set forth in Sterling Morton,38 B.T.A. 1270 (1938), affd. 112 F. 2d 320 (7th Cir. 1940). There, at pp. 1278-9 the Board said: From an examination of these cases it is apparent that a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered *400 as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock. The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If *401 its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and cannot be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. See also Charles W. Steadman,50 T.C. 369 (1968), affd. 424 F. 2d 1 (6th Cir. 1970), cert. denied 400 U.S. 869 (1970); Herbert W. Dustin,53 T.C. 491 (1969), affd. 467 F. 2d 47 (9th Cir. 1972). Applying these standards to the facts herein, we think it is clear that the Construction, Inc. stock was not worthless in 1963. It was Malmstedt's uncontroverted testimony that the stock had some value at the time of his endorsement (in November, 1963), and that such value would have increased had Johnson been successful in her quest to develop Gold Mine. Such value precludes a finding that the stock was worthless in 1963. Sterling Morton,supra *402 at 1278, 1279. It is our opinion that the stock did lose all value in 1964. Admittedly, no balance sheets were introduced revealing the exact financial condition of Construction, Inc. at the close of 1964, and the precise operation and assets of each of petitioners' controlled entities is somewhat obscure. Be that as it may, the record leaves no room for doubt that nearly the entire time and assets of both petitioners and their entities (including Construction, Inc.) were devoted to the Gold Mine venture during the years 1960 through 1964. In 1964, when Gold Mine was lost via the foreclosure proceedings, not only was petitioners' primary asset lost, but insufficient assets remained to satisfy the deficiency remaining after dispersal of the foreclosure proceeds. We can only conclude that Construction, Inc. had no liquidating value at the close of 1964. We also find that Construction, Inc. lacked potential value at the close of 1964. It is undisputed that after 1963 its sole purpose was to enable Johnson to fulfill her dream of completing the Gold Mine project, a dream that became a nightmare and dissipated in 1964 when the second foreclosure sale took place. It appears that the *403 full scope of its activities embraced Gold Mine activities and nothing more. When the Gold Mine was sold the activities of Construction, Inc. perse, ceased. Therefore we believe the foreclosure sale is the identifiable event pinpointing the loss of potential value. To reach a contrary conclusion would ignore the interrelationship of petitioners and their entities and would place us one step beyond the mainstream of common experience which must be the ultimate foundation of our decision. We hold that the stock of Construction, Inc. became worthless in 1964. What we have said precludes the worthless stock deduction claimed by Malmstedt as his stock was not worthless in 1963, and in 1964, the year of worthlessness, he owned no stock in Construction, Inc. This leaves for our decision the amount which Johnson is entitled to deduct based on her worthless stock, a decision which must rest upon her basis in the shares she owned in 1964. With respect to the shares acquired upon the incorporation of Construction, Inc. we have found her basis to be $82,062.32 and conclude she is entitled to a deduction in this amount. She is not, however, entitled to a deduction for the worthlessness *404 of the shares she acquired from Malmstedt. This is so because pursuant to section 1.165-1(c), Income Tax Regs. the amount of loss deductible may not exceed the adjusted basis for determining loss which in the context of property acquired by gift is the lesser of the adjusted basis of the donor or the fair market value of the property at the time the gift was made. Section 1015. Since Johnson proffered no evidence bearing on the fair market value of the gift of November, 1963 she must be denied a deduction for the worthlessness thereof. Issue 8. Use of Corporate Property
During the years 1965 and 1966 Malmstedt and Johnson used, without charge, a truck owned by Tuscarora, and respondent determined that such use constituted taxable income under section 61 in the following amounts: 1965
1966
Malmstedt
$387.50
$483.00
Johnson
387.50
483.00 Petitioners' evidence consisted of Johnson's testimony that they used the truck only for business purposes. Such testimony is not sufficient to overcome respondent's determination which is sustained. *405 Welch v. Helvering,supra.Dodd v. Commissioner,supra.
Issue 9. Joint Return Status
Although they were married during the calendar year 1965, Malmstedt and Johnson filed separate tax returns for the calendar years 1965 and 1966. Respondent mailed his statutory notices of deficiency for these years to Malmstedt and Johnson respectively on June 1, 1971 and they filed their respective petitions with this Court on July 2, 1971. In their respective amended petitions, filed July 3, 1973, they alleged for the first time that they were entitled to file a joint return for 1966 and on brief assert their right to do so for 1965. Respondent contends they are barred from this course of action by section 6013(b)(2)(C). Section 6013(b)(1) provides, in general, that a husband and wife who have filed separate returns may subsequently elect to file a joint return. Section 6013(b)(2)(C), however, circumscribes this right by providing that such election cannot be made, "after there has been mailed to either spouse, with respect to such taxable year, a *406 notice of deficiency under section 6212, if the spouse, as to such notice, files a petition with the Tax Court of the United States within the time prescribed in section 6213". Petitioner argues that section 6013(b)(2)(C) is inapplicable to the facts herein because the amended petitions filed in this case request us to consider a joint return and because a joint return is appropriate where the activities of husband and wife were common to each other. Petitioners' position is without merit. The facts presented herein fall squarely within the language of section 6013(b)(2)(C) and petitioners may not now elect to file a joint return for the years 1965 or 1966. Constance B. Kirby,35 T.C. 306 (1960). Issue 10: Deduction for Travel Expense
During its fiscal year ended July 31, 1966, Tuscarora incurred expenses in connection with a trip taken by Malmstedt and Johnson to Little Abaco, Bahamas for the purpose of examining real estate it had been requested to sell. Tuscarora deducted and respondent disallowed $500 as a business expense for moneys expended in connection with this trip. Respondent urges us to uphold his disallowance contending that Tuscarora has failed *407 to meet the substantiation requirements of section 274(d). Section 274(d), which limits the deductions permissible under section 162 provides: (d) Substantiation Required.--No deduction shall be allowed-- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), * * *
unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount fo such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item and, (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations. The sole evidence presented on this issue was the testimony of Johnson *408 concerning the purpose and estimated cost of the trip. Neither records nor any corroborating evidence were introduced. Unfortunately for Tuscarora, the uncorroborated, self-serving testimony of Johnson is insufficient to meet the statutory substantiation requirements and respondent's determination on this issue is sustained. John L. Ashby,50 T.C. 409, 415 (1968). Decisions will be entered under Rule 155 in docket Nos. 4647-71 and 4649-71 and, Decision will be entered for the Respondent in docket No. 4648-71.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Tuscarora Realty, Inc., docket No. 4648-71; and Bertil Malmstedt, docket No. 4649-71.↩
2. This deficiency pertains to the fiscal year ended July 31, 1966.↩
3. Johnson and Malmstedt each had a 50 percent interest in the partnership.↩
4. These figures are based upon our examination of the records of Construction which disclosed the respective capital accounts of Malmstedt and Johnson at the time of incorporation, and upon the testimony of Alfred E. Trout, an agent of respondent, who examined these records prior to trial.↩
5. Properties was owned equally by Malmstedt and Johnson.↩
6. Apparently the contract was assigned by Construction to Properties which briefly held title in a nominal capacity. The reduction in the cost of the property resulted from Johnson's waiver of a $30,000 real estate commission when she becamse a member of the purchasing group. She never reported this amount as income. ↩
7. The holder of this note at the time of the 1964 foreclosure sale was Samuel F. Thomas.↩
8. The invoices for the furnishings are in the name of Construction, Inc. Apparently petitioners were using it as a vehicle for writing checks at that time.↩
9. This price was determined by an expert's appraisal of the property. The sharp appreciation in value was alleged to be the result of the zoning change and other preliminary work done in connection with the Gold Mine project. ↩
10. This trust, held by Universal Mortgage Company, was due July 25, 1961. The record does not disclose whether Universal Mortgage was a successor to the Washington Mortgage and Development Company. ↩
11. This trust, held by Swanson, was due January 25, 1965.↩
12. The amount realized was set forth as $6,200,000 rather than $7,000,000 as set forth in the original contract for sale. No explanation for this discrepancy appears in the record. The gain was computed as follows: ↩
Sales price
$6,200,000.00
Cost
1,159,110.13
Gross profit
5,040,889.87
Mortgage assumed
1,525,000.00
Excess of mortgage
365,889.87
over basis
13. The 1963 partnership return also erroneously showed gross income of $152,524.75 which sum in fact represented loan repayments, and showed deductions for expenditures in connection with the Gold Mine project in the amount of $381,664.19. Respondent determined that these deductions were not deductible as business expenses but allowed Malmstedt itemized nonbusiness deductions of $10,689.66 consisting of taxes, interest and travel for the year 1963.↩
14. The holder of the note was Samuel F. Thomas who charged petitioners a refinancing fee of $150,000 in connection with this loan.↩
15. Properties, Inc., the maker, and the guarantors, Johnson, Construction, Inc., Malmstedt, and Joseph Stroud were released from liability for this deficiency in 1965.↩
16. Johnson treated this item as a business deduction on her 1964 return.↩
17. All statutory references are to the Internal Revenue Code of 1954, as amended unless otherwise indicated. Due to our conclusion on this issue we need not determine whether this is a correct application of sec. 1038↩.
18. Respondent in his notice of deficiency to Malmstedt determined that the joint venture had incurred $21,379.32 of deductible expenses. On brief he contends that these too, should be capitalized.↩
19. These expenses consist of the following: ↩
1962:
Interest
$168,062.50
Insurance
3,392.21
Real estate taxes
1,586.82
State stamps
6,847.50
Total
$179,889.03
1963:
Taxes
4,078.80
Interest
15,551.61
Travel
1,748.91
Total
$21,379.32
20. Whether or not the interest expense also qualifies as an ordinary and necessary business expense will be treated infra.↩
21. SEC. 172(d)(4)↩. Nonbusiness deductions of taxpayers others than corporations.--In the case of a taxpayer other than a corporation, the deductions allowable by this chapter which are not attributable to a taxpayer's trade or business shall be allowed only to the extent of the amount of the gross income not derived from such trade or business. For purposes of the preceding sentence-- * * *
22. In so holding we are aware the Fourth Circuit's decision in York v. Commissioner,261 F. 2d 421 (4th Cir. 1958), revg. 29 T.C. 520↩ (1957). In that case the Court held that the business of commercial development and industrial development were one in the same. We do not feel the same can be said for small residential development and commercial development and think that case is therefore distinguishable from the instant case.
23. No such deduction was allowed to Malmstedt as the statutory notice pertaining to him asserted no deficiency for 1964.↩
24. We recognize that Malmstedt and Johnson were technically not the principal obligors on the loans, but believe that the record clearly demonstrates that from the start they would ultimately be called upon to make any payments thereon in their individual capacities. ↩
25. Malmstedt's 1964 taxable year is not a year in issue.↩
26. Apparently such argument was advanced since 1963 appears to be a closed year for Johnson, and 1964 a closed year as to Malmstedt.↩