Werner ABEGG, Appellee,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Appellant.

CRESTA CORPORATION, S.A.,
Transferee, Appellant,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Appellee.

Nos. 622, 623, Dockets 34136, 34146.

United States Court of Appeals,
Second Circuit.

Argued May 28, 1970.

Decided July 14, 1970.

Emilio A. Dominianni, New York City (John E. McDermott, Jr., Michael Keating and Coudert Brothers, New York City, of counsel), for Werner Abegg and Cresta Corporation.

Paul M. Ginsburg, Atty., Department of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson and Thomas L. Stapleton, Attys., Dept. of Justice, Washington, D. C., of counsel), for Commissioner of Internal Revenue.

Before WATERMAN, FRIENDLY and HAYS, Circuit Judges.

FRIENDLY, Circuit Judge:

These two appeals from a decision of the Tax Court, 50 T.C. 145, one by the taxpayer and the other by the Commissioner, concern a series of transactions in which Werner Abegg, a Swiss citizen, liquidated one wholly-owned personal holding company and transferred all its assets, plus other securities in substantial amount, to another personal holding company. Although the appeals relate to different tax years and present independent legal issues, there is a sufficient identity in the dramatis personae to make it convenient to state all the facts at the outset.

## I.  *The Facts*

Hevaloid Corporation was organized under the laws of Delaware in 1938. All its issued stock, 250 shares, was held by Abegg. It owned industrial patents and machinery which it leased to various American corporations. In 1955 the patents expired and it sold the machin-ery. In 1956 and 1957 it was a personal holding company; its assets consisted exclusively of cash, securities, receivables, and rights in a motion picture "Guest in the House." In 1957, Robert A. Cavin, a close associate and business adviser of Abegg for many years, was its president.

On March 28, 1957, Hevaloid adopted a plan of complete liquidation and dissolution. A certificate of dissolution was filed on April 18. During April and May it sold stock in four publicly owned corporations for $1,671,341, which it deposited in the New York Trust Company. These sales represented a gain of $932,701. Hevaloid reported them in its 1957 income tax return but claimed that the gain was not to be recognized under I.R.C. § 337. On May 1 and 2 it drew checks to Abegg on its account at New York Trust Company aggregating $1,-660,936. On May 7 it delivered to Laird & Co., a New York brokerage firm, for Abegg's account, certificates and stock powers for 7,470 shares of Brazos River Gas Company, 2,720 shares of Medallion Petroleum Limited, and 13,692 shares of Producing Properties, Inc. On May 23 it directed Laird & Co. to transfer from the account of Hevaloid to the account of Abegg 1,945 shares of Magma Copper Company and 2,600 shares of Signal Oil and Gas Company; on the same day it also transferred to Abegg its interest in a loan receivable from Perosa Corporation and in the motion picture. The final step in its liquidation was taken in December 1957 by drawing to Abegg a $32,156 check on another bank. Abegg deposited all these checks in his account at Bankers Trust Company.

Cresta Corporation, S.A., originally known as Suvretta Corporation, S.A., was incorporated in Panama in 1941 but remained inactive. On May 7, 1957, it issued 1,000 shares of stock to Abegg in return for cash and other assets, as follows: On May 7, 1957, Abegg issued to it a $1,500,000 check on his account at

Bankers Trust Company, $250,000 of which was considered a demand loan and $1,250,000 as part payment for stock. On May 24, Laird & Co., on Abegg's instruction, transferred to Cresta in further payment the five securities that Hevaloid had ordered it to transfer to him earlier that month. The fair market value of each security exceeded its adjusted basis; the aggregate excess was $262,520. The same day Abegg transferred stock of Illinois Central R. R., Olin Mathiesen Chemical Corporation, additional common shares and a note of Brazos River Gas Company, preferred stock and bonds of Producing Properties, Inc., 1,000 shares of Perosa Corporation, which were regarded as valueless, and 3,000 shares of Meridan Corporation, a Rhode Island corporation in which he owned 50% of the stock and Cavin 10%. Meridan had a net worth of $2,510,673 as of December 31, 1957. Nearly sixty per cent of this represented a piano business in Michigan; it also had an interest in an operating company in Chicago and later acquired one in a company in Tacoma, Washington. On June 8 Abegg transferred to Cresta the interest in "Guest in the House" and in the debt from Perosa Corporation which Hevaloid had assigned.

The directors of Cresta, including Abegg and Cavin, met on February 6, 1958, in New York and resolved to qualify to do business in that state, to accept cash and securities from Abegg as contributions to capital, and to borrow an additional $250,000 from him on open account. Abegg drew a check for $400,000 and on February 26, 1958, contributed stock as follows:

|  | Adjusted Basis | Fair Market Value |
|---|---|---|
| 50,680 shares Brazos River Gas Co. | $ 55,850 | $101,360 |
| 4,250 shares General American Oil Co. | 91,653 | 110,578 |
| 12,650 shares Magma Copper Co. | 1,300,971 | 449,075 |
|  | $1,448,474 | $661,013 |

Cavin was Cresta's sole employee in its fiscal years ending February 28, 1958 and 1959 and February 29, 1960. He maintained watch over its holdings, especially those in Meridan, and investigated at least a dozen opportunities for investing Cresta's funds with a view to acquiring the stock or assets of a going business, although no acquisitions were made. In these years Cresta paid salaries to Cavin aggregating $46,750, and also some $50,000 in legal, accounting, travel and other business expenses.[1] Cresta filed income tax returns as a personal holding company.

Only a few further facts need be stated: Abegg was not engaged in trade or business within the United States. In 1957 he was in the country only from January 1 to March 27. He was here more than 90 days in 1958. At the time when the Commissioner sent a notice of deficiency to Cresta as Hevaloid's transferee, Abegg had net assets in the United States more than sufficient to pay the tax allegedly owing from Hevaloid.

## II. Cresta's Appeal

Viewed alone the liquidation of Hevaloid meets the requirements of I.R.C. § 337(a).[2] The Commissioner does not

---

[1] An issue that was litigated before the Tax Court but is not before us in whether, as Cresta claimed, it was engaged in a trade or business within the United States, so as to be entitled to these deductions under IRC § 882, or, as the Commissioner contended, was not so engaged and was therefore subject to the 30% tax on gross income imposed by IRC § 881(a). The Tax Court decided in favor of the Commissioner. Cresta did not seek review of that decision and relies on it for one of its arguments on the appeal it has taken.

[2] "If—
  (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and
  (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to

dispute this, nor its corollary that if § 337 is applied, the $932,701 gain realized by Hevaloid on the sale of securities and Abegg's gain on the liquidation would escape United States taxation altogether. Hevaloid would not be taxable because of § 337(a). Abegg would not be taxable on the gain from the liquidation of Hevaloid because as a nonresident alien, not engaged in trade or business within the United States, who was present in the United States for fewer than 90 days in 1957, he was subject to United States taxation only on capital gains from sales or exchanges of personal property in the United States while he was present here,[3] and Hevaloid's liquidating distributions were carried out during his absence.

On February 19, 1962, the Commissioner mailed to Cresta as transferee a notice of deficiency reading as follows:

The reported liquidation of Hevaloid Corporation, the transfer of assets to W. Abegg and the retransfer of such assets by him to Cresta Corporation, S.A. were in substance, component steps in a reorganization within the meaning of section 368(a) of the Internal Revenue Code of 1954. Accordingly, the benefits of section 337 of the Internal Revenue Code of 1954 are not applicable and the capital gains realized on the sale of assets as shown in the 1957 return of Hevaloid Corporation, are includible in gross income.

Since, in substance, Hevaloid Corporation in the course of reorganization transferred assets to Cresta Corporation, S.A., a foreign corporation and did not secure clearance under section 367 of the Internal Revenue Code of 1954 prior to the transfer, Hevaloid Corporation is denied the benefits of section 361(a) of the Internal Revenue Code of 1954. The gains realized on the transfer as computed in Exhibit A are recognized.[4]

The gains from Hevaloid's sales of securities amounted, as previously indicated, to $932,701; the gains from the transfers to Cresta of property which Abegg had received from Hevaloid were $262,519 with respect to securities stated above, plus $4,725 with respect to "Guest in the House." The Tax Court sustained the Commissioner.

Cresta does not dispute that if the result of the 1957 transactions had been achieved by a straightforward reorganization under § 368(a) (1) (D), the gains realized by Hevaloid on sales of securities would not come under the nonrecognition shelter of § 337 and the gains realized on transfers of appreciated securities would likewise be taxable since they would qualify for non-recognition only by virtue of §§ 351 and 354(a) (1), and that protection was lost by failure to obtain a ruling under § 367. It nevertheless contested the determination of deficiency on three grounds. It claimed that the reorganization provisions are

such corporation from the sale or exchange by it of property within such 12-month period."

3. I.R.C. § 871. The section was extensively amended by Pub.L. No. 89–809, Title I, § 103(a) (1), 80 Stat. 1547 (1966), and now taxes nonresident aliens on capital gains not effectively connected with the conduct of a trade or business in this country only if the alien was present in this country for 183 days or more during the taxable year. See S.Rep. No. 1707, 89th Cong., 2d Sess., reprinted in 1966 U.S.Code Cong. & Adm.News, pp. 4446, 4467–4470.

4. Section 367, no paradigm of draftsmanship, provides:

Sec. 367. Foreign Corporations.
In determining the extent to which gain shall be recognized in the case of any of the exchanges described in section 332, 351, 354, 355, 356, or 361, a foreign corporation shall not be considered as a corporation unless, before such exchange, it has been established to the satisfaction of the Secretary or his delegate that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes. For purposes of this section, any distribution described in section 355 (or so much of section 356 as relates to section 355) shall be treated as an exchange whether or not it is an exchange.

not applicable to corporations that are mere personal holding companies; that if that position were rejected, the judicially created "liquidation-reincorporation" doctrine on which the Commissioner relied should not be applied when what has come to be a personal holding company as a result of the cessation of an active business distributes liquid assets to its sole stockholder; and, in any event, that, since the transfer from Hevaloid to Cresta was routed through Abegg and he was financially able to pay any tax owed by Hevaloid, Cresta was not liable as a transferee. The Tax Court rejected all three contentions. Although Cresta's arguments are not without force, we agree with the Tax Court.

■ Cresta concedes, as it must, that no case directly holds the reorganization provisions inapplicable to personal holding companies, and, indeed, the one case cited that considered the question is to the contrary. Estate of Elise W. Hill, 10 T.C. 1090 (1948). Cresta nevertheless points to language in the Regulations and in judicial decisions referring to the need for a "business purpose" for the reorganization [5] or for a "continuation of the business enterprise." [6] Relying in part on the Tax Court's ruling that it was not engaged in a trade or business for purposes of I.R.C. § 882, see fn. 1, Cresta contends that the activities of a mere holding company are not enough of a "business" to satisfy these requirements. However, the language Cresta cites was not remotely addressed to the issue here under consideration, and we see no warrant for ruling that a personal holding company may not take advantage of the reorganization provisions if their requirements are otherwise met. Certainly it would be hard to require a personal holding company or its shareholders to recognize gain when the company undergoes "a statutory merger or consolidation," "a recapitalization," or "a mere change in identity, form or place of organization" within I.R.C. § 368(a) (1) (A), (E), and (F), and there would be little virtue in permitting them to take a loss at will by such a transaction. Thus we think it plain that reorganizations of personal holding companies fall within "the plain intent of the statute," Gregory v. Helvering, supra, 293 U.S. at 470, 55 S.Ct. at 268, and should be treated accordingly. Indeed, the examples in § 1.381(c) (14)–1(c) of the Regulations explicitly assume that a personal holding company may result from a reorganization.

Cresta's second argument, relating to the judge-made "liquidation-reincorporation" doctrine,[7] is more appealing, but not appealing enough. The doctrine indeed has its elements of curiosity. Building on statutory provisions intended for the benefit of taxpayers, over which the Treasury has vigilantly stood

5. Helvering v. Gregory, 69 F.2d 809, 811 (2 Cir. 1934), aff'd, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935): "the underlying presupposition is plain that the readjustment shall be undertaken for reasons germane to the conduct of the venture in hand, not as an ephemeral incident, egregious to its prosecution." The requirement also appears, less elegantly, in § 1.368–2(g) of the Regulations.

6. Lewis v. C.I.R., 176 F.2d 646 (1 Cir. 1949). See also Regs. § 1.368–1(b).

7. The House draft of the 1954 Code, H.R. 8300, 83d Cong., 2d Sess., § 357 (1954), attempted to deal with the problem in a manner that would not have helped the Commissioner in this case, since the proposed statute would have applied only when the distributee transferred more than 50% of the assets received on liquidation other than money and stock and securities (except stock or securities of the distributing corporation). This was deleted by the Senate without explanation. The House Managers attributed the deletion to "certain technical problems," and explained their acquiescence on the grounds "that, at the present time, the possibility of tax avoidance in this area is not sufficiently serious to require a special statutory provision" and that any such possibility "can appropriately be disposed of by judicial decision or by regulation within the framework of the other provisions of the bill." H.R.Rep. No. 2543, 83d Cong., 2d Sess. 41 (1954), reprinted in 1954 U.S.Code Cong. & Adm. News, pp. 5280, 5301. We do not regard any of this to be significant.

guard, it forces their consequences on taxpayers who want nothing of them. See Hewitt and Cuddihy, The Liquidation Reincorporation Problem, a Running Tax Battle, 12–13 (1969). However, the tax avoidance purposes that can be served by "the liquidation of a corporation followed by a transfer of part or all of the assets to a newly-organized corporation owned by the same shareholders" are so numerous and serious, see Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, 569–570 (2d ed. 1966), that the doctrine had to be created. In any event it is too late to question its vitality and Cresta does not do so.

■ It is true enough that the vice of liquidation-reincorporation appears most clearly when a company engaged in active business purports to liquidate but the shareholders then put the operating assets back into a new corporation. Although as a practical matter incorporation is a necessity for the business, the shareholders by a mere sleight of hand would have withdrawn earnings and profits on payment only of a capital gains tax and would have achieved a stepped-up basis for appreciated assets if the liquidation-reincorporation doctrine did not prevent. There seems to be no similar necessity for stockholders who have received only liquid assets on liquidation to transfer them to a new corporation. However, Abegg evidently decided it was to his advantage that the management of certain of his liquid assets in the United States which the Delaware corporation had come to own as a result of cessation of its active business, as well as other assets transferred by him, should not be conducted by him, but rather by a Panamanian corporation qualified in New York, which should seek out opportunities for acquiring active businesses. As has been said, "The 'reincorporation' problem arises when taxpayers seek to combine the benefits of a complete liquidation (i. e., capital gain or loss on the distribution, a new basis for the assets, and elimination of corporate earnings and profits), with

the 'reorganization' advantages of continued operation of the business in corporate form." Bittker & Eustice, *supra*, at 572. That is precisely what happened here, see Hewitt and Cuddihy, *supra*, at 95–103; it was Abegg's decision to put the cash and securities derived from the liquidation of Hevaloid back into Cresta, rather than retain them in his own accounts with attendant freedom from United States taxes.

■ Cresta's argument that Hevaloid had already liquidated when it ceased its active business and thus could not liquidate again is mostly a play upon words. Like many other terms, liquidation does not mean in tax language what it may in ordinary speech. The Regulations, § 1.332–2(c), instruct that "A status of liquidation exists when the corporation ceases to be a going concern and its activities are merely for the purpose of winding up its affairs, paying its debts, and distributing any remaining balance to its stockholders." Hevaloid did not attain that status until the spring of 1957. We do not regard Pridemark, Inc. v. C.I.R., 345 F.2d 35 (4 Cir. 1965), relied on by Cresta, as conflicting in any way with the result reached here. The Commissioner in that case apparently did not argue that a "D" reorganization had occurred, but only that no "complete" liquidation had occurred within the meaning of § 337, or alternatively that the liquidation and subsequent incorporation there consituted an "F" reorganization. See 345 F.2d at 41. The court rejected the first contention on the ground that the liquidation of the old company was intended to be complete and final, and the starting up of the new company was a later idea, hit upon only after the owners had been unsuccessful in other lines of business. The second contention was rejected on the ground that the shifts in officers and shareholder interests, along with the operating scale of the new company, were simply too much to be called a "mere change in identity, form, or place of organization." It is apparent that neither basis of the decision is applicable here.

Cresta's final point goes to the question of transferee liability. The Supreme Court held in Commissioner v. Stern, 357 U.S. 39, 42, 45, 78 S.Ct. 1047, 1049, 1051, 2 L.Ed.2d 1126 (1958), that the predecessor of § 6901(a) [8] of the present code "neither creates nor defines a substantive liability but provides merely a new procedure by which the Government may collect taxes," and that "the existence and extent of liability should be determined by state law," here presumably the law of New York. Cresta contends that Hevaloid's transferee was Abegg, who could have been assessed until March 15, 1962, and that it cannot be held as transferee of Abegg because at the time of that transfer Abegg had assets in the United States sufficient to pay the tax. For the latter branch of its argument it relies on § 273 of New York's Debtor and Creditor Law, McKinney's Consol. Laws, c. 12, making insolvency of the debtor an essential element of a fraudulent conveyance in the absence of actual fraud, which is not asserted by the Commissioner here.

■ However, although we have found no New York case directly in point, opinions such as those in Salner Realty Corp. v. Nancy Lee Millinery, Inc., 262 App.Div. 491, 30 N.Y.S.2d 596 (1st Dept.1941), and Beol, Inc. v. Dorf, 22 Misc.2d 798, 193 N.Y.S.2d 394 (Sup. Ct.1959), aff'd mem., 12 A.D.2d 459, 209 N.Y.S.2d 267 (1st Dept.1960), appeal dismissed, 9 N.Y.2d 963, 218 N.Y. S.2d 43, 176 N.E.2d 499 (1961), illustrate the concern New York shows for creditors of one corporation who suddenly find that its assets have been shuttled, mediately or immediately, to another controlled by the same interests. We therefore do not believe that the New York courts would regard Abegg's momentary ownership of Hevaloid's assets as sufficiently significant to free Cresta from the transferee liability to which it would otherwise have been subject.

### III. *The Commissioner's Appeal*

■ The Commissioner also determined a deficiency with respect to Abegg's contributions to Cresta of 50,-680 appreciated shares of Brazos River Gas Co. and of 4,250 appreciated shares of General American Oil Co. on February 26, 1958. He started from the fact that Abegg was present in the United States for more than 90 days in 1958, and from I.R.C. § 871(a) (2) (B) and (b) which subject a nonresident alien so present to tax on "sales and exchanges of capital assets effected at any time during such year" in excess of losses from such sales and exchanges. He acknowledged that if Cresta had been a United States corporation, the contribution on his view would be protected by § 351, which provides for non-recognition of gain or loss "if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation." But here again, the Commissioner contended, § 367, reared its ugly head in Abegg's path. For, as stated in fn. 4, § 367 mandates that "in determining the

---

8. Sec. 6901. Transferred Assets.
   (a) *Method of Collection.*—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:
   (1) *Income, estate, and gift taxes.*—
   (A) *Transferees.*—The liability, at law or in equity, of a transferee of property—

   (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),
   (ii) of a decedent in the case of a tax imposed by chapter 11 (relating to estate taxes), or
   (iii) of a donor in the case of a tax imposed by chapter 12 (relating to gift taxes),
in respect of the tax imposed by subtitle A or B.

extent to which gain shall be recognized in the case of any of the exchanges described" in various sections including § 351, "a foreign corporation shall not be considered a corporation" unless before such exchange a ruling has been obtained that the exchange is not in pursuance of a plan having federal income tax avoidance as a principal purpose, and it is stipulated that this was not done here.

In answer to the argument that since Abegg received nothing in exchange and thus realized no gain within the meaning of § 1001(b), the Commissioner contended that issuance of stock by a corporation to a 100% shareholder is a meaningless ritual. He cited cases, notably C.I.R. v. Morgan, 288 F.2d 676 (3 Cir.), cert. denied, 368 U.S. 836, 82 S.Ct. 32, 7 L.Ed.2d 37 (1961), and Davant v. C.I.R., 366 F.2d 874, 884–887 (5 Cir. 1966), cert. denied, 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460 (1967), which applied the liquidation-reincorporation doctrine to find a "D" reorganization although the transfer was from one owned corporation to another and there was no "distribution" of stock of the latter. He also relied on the holding in King v. United States, 10 F.Supp. 206 (D.Md.), aff'd, 79 F.2d 453 (4 Cir. 1935), that a corporation which received property from its sole shareholder without consideration took the latter's basis under § 204(a) (8) of the Revenue Act of 1926, relating to property acquired by a corporation "by the issuance of its stock or securities" in a transaction where the seller's gain or loss was not recognized.[9] In answer to the point that the aggregate effect of the three security trans-

fers on February 26, 1958, was a loss of $787,461, the Commissioner responded, in line with Rev.Rul. 67–192, 1967–2 Cum.Bull. 140, that § 367 cancels only the nonrecognition of gain provided by § 351 but leaves intact that section's provision for nonrecognition of loss.

Not reaching the last point, the Tax Court found determinative the absence of any stock issuance in exchange. It refused to follow Rev.Rul. 64–155, 1964–1 Cum.Bull. (Part 1) 138, in which the Commissioner took the same position he urges here, and it distinguished King v. United States, supra, 10 F.Supp. 206, and C.I.R. v. Morgan, supra, 288 F.2d 676, on which that ruling had relied. The Commissioner vigorously challenges this holding. He cites the report of the Senate Finance Committee which explained the importance of § 112(k) of the Revenue Act of 1932, the progenitor of § 367, in preventing tax avoidance by a procedure whereby a taxpayer with large unrealized profits in securities would transfer them to a foreign corporation in exchange for its stock without recognition of gain under the predecessor of § 351, would have the foreign corporation sell the securities in a foreign country imposing no tax on the gain, would cause the foreign corporation to invest the proceeds in the stock of a new American subsidiary, and would then have the foreign corporation distribute the latter's stock in a tax-free reorganization. S.Rep.No. 665, 72d Cong., 1st Sess., pp. 26–27, 1939–1 Cum. Bull. (Part 2) 496, 515.[10] The Commissioner argues that the tax avoidance potential would be equally great where a

9. Abegg seeks to distinguish *King* on the basis that the shares in question were contributed within 30 days of the issuance of stock for other shares owned by the organizer and the delay apparently was accidental. Congress solved the problem that gave rise to the *King* case and also to Rosenbloom Finance Corp., 24 B.T.A. 763 (1931), rev'd 66 F.2d 556 (3 Cir.), cert. denied, 290 U.S. 692, 54 S.Ct. 127, 78 L.Ed. 596 (1933), by enacting § 113 (a) (8) of the Revenue Act of 1932, now I.R.C. § 362, which provided that a cor-

poration takes the transferor's basis for property acquired "by the issuance of its stock or securities in connection with a transaction described in section 112(b) (5)" *or* "as paid-in surplus or as a contribution to capital."

10. For another example, wherein the appreciated securities are owned by a United States corporation, see Section 367 and Tax Avoidance: An Analysis of the Section 367 Guidelines, 25 Tax L.Rev. 429, 432 (1970).

sole shareholder contributed appreciated securities to an existing foreign corporation, possibly with only a nominal capitalization.

That is very likely so, but the 1932 Congress took steps to deal expressly with that problem so far as United States citizens were concerned. By § 901 of the Revenue Act of 1932, now carried forward as I.R.C. § 1491, it imposed on "the transfer of stock or securities by a citizen or resident of the United States, or by a domestic corporation or partnership, or by a trust which is not a foreign trust, to a foreign corporation as paid-in surplus or as a contribution to capital, or to a foreign trust, or to a foreign partnership, an excise tax equal to 25 per centum of the excess of (1) the value of the stock or securities so transferred over (2) its adjusted basis in the hands of the transferor * * *"; § 902(b) made this tax inapplicable "if prior to the transfer it has been established to the satisfaction of the Commissioner that such transfer is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes." [11] See S.Rep. No. 665, 72d Cong., 1st Sess., pp. 55–56, 1939–1 Cum.Bull. (Part 2) 496, 536. If the combination of § 112(k) and 112(b) (5), the predecessor of I.R.C. § 351, reached a contribution to the capital or paid-in surplus of a foreign corporation, § 901 was unnecessary, since Congress obviously did not mean that in the absence of an advance ruling by the Commissioner such a contribution by a United States citizen should be subjected both to income taxation on any excess of value over basis and to excise taxation on the same amount, whereas an exchange in the literal sense should be subjected only to the former. Hence, unless § 901 is to be a dead-letter, § 112(k) must be read as not reaching a contribution to the capital of a foreign corporation by a United States citizen taxpayer covered by § 901.[12] But it would be anomalous to hold that although the combination of § 112(k) and § 112(b) (5) of the 1932 Act, now I.R.C. § 351, did not reach the important subject of contributions of appreciated assets to capital or paid-in surplus by a United States citizen to a foreign corporation, which Congress felt obliged to cover separately in § 901, it did reach contributions of such assets as capital or paid-in surplus by nonresident aliens. While the alternative, distinguishing among transfers by nonresident aliens to wholly-owned foreign corporations on the basis of whether they take stock back, is also anomalous, it is less so. Indeed, the real anomaly may be in a nonresident alien's being caught in the net at all, when he could have avoided the problem altogether by selling the securities abroad and transferring the proceeds. If there are significant avenues of tax avoidance in respect of the contribution by nonresident aliens of appreciated assets to capital or surplus of foreign corporations in the United States, the Commissioner has not brought them to our attention.

To put the matter in another way, since the legislative history shows that § 367 was aimed primarily at tax avoidance by United States taxpayers, nonresident aliens should not be subjected to it in a situation where, as regards United States citizens, Congress thought it necessary to make a special although similar provision. Counsel for a nonresident alien reading § 901 of the 1932 Act or § 1491 of the 1954 Code would be abundantly justified in thinking that Congress meant to require advance approval of contributions to the capital or paid-in surplus of a foreign corporation only when these were made by the persons

11. These two sections of the 1932 Act became I.R.C. §§ 1491 and 1492(2) except that the rate was increased to 27½%.

12. The Commissioner conceded at argument that if we should sustain his position as to the coverage of § 367, it would be necessary to issue a ruling, which he undertook to do, that the same transaction was not to be subjected both to income and to excise tax.

there described. It may well be, as the Commissioner suggests, that § 901, like the change in § 113(a) (8) of the 1932 Act, see fn. 9, represented an unnecessary overreaction to the decision of the Board of Tax Appeals with respect to contributions to capital or surplus in the *Rosenbloom* case, and that if Congress had only remained silent, the courts would have handled the problem. But Congress did what it did, and a taxpayer is justified in assuming that it cast its net no further. Agreeing with the Commissioner that the problem is considerably more difficult than the Tax Court thought, we thus believe it reached the right result.

On both appeals the judgment of the Tax Court is affirmed. No costs.