115 T.C. No. 23

UNITED STATES TAX COURT

ARCHIE L. AND LOUISE B. HONBARRIER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

HONBARRIER, INC., FORMERLY CENTRAL TRANSPORT, INC., SUCCESSOR
TO COLONIAL MOTOR FREIGHT LINE, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent.

Docket Nos. 9053-97, 9054-97.  Filed September 29, 2000.

H was the sole shareholder of P.  P was engaged in
the business of hauling packaged freight in trucks.
Its trucking operations were terminated in 1988.  By
1990, P had sold its operating assets.  P invested the
proceeds from the sale of its operating assets in tax-
exempt bonds and a municipal bond fund.

C was a privately held trucking company that
operated as a bulk carrier of chemicals.  The majority
of C's stock was owned by H.

On Dec. 31, 1993, P was merged into C.  Pursuant
to the merger, H received 17,840 shares of C stock for
his P stock.  The value of the 17,840 shares was
determined to be equal to the net fair market value of
P's assets.  P and H treated the merger as a tax-free

reorganization within the meaning of sec. 368(a)(1)(A), I.R.C.  R determined that the merger failed to meet the continuity of business enterprise requirement necessary to qualify as a tax-free reorganization within the meaning of sec. 368(a)(1)(A), I.R.C.

Prior to the day of the merger, P's assets consisted of tax-exempt bonds, a municipal bond fund, and $1,500 in cash.  On the day of the merger, P liquidated one of its tax-exempt bonds and its municipal bond fund.  As a result, P's assets at the time of the merger consisted of $2,415,321 in cash, $4,849,146 in tax-exempt bonds, $37,800 in interest and dividends receivable, and $18,926 in money funds.  At the time of the merger, C distributed $7 million to C's shareholders.  This distribution was made with checks totaling $2,450,854 and tax-exempt bonds worth $4,549,146 that had been acquired from P.  Within 4 months, C had disposed of the remaining tax-exempt bond that it had acquired from P in the merger.

Held:  In order for a merger to be a tax-free reorganization within the meaning of sec. 368(a)(1)(A), I.R.C., there must be continuity of the business enterprise of the acquired corporation.  See sec. 1.368-1(b), Income Tax Regs.  Continuity of business enterprise requires that the acquiring corporation either continue the acquired corporation's historic business or use a significant portion of the acquired corporation's historic business assets in a business. See sec. 1.368-1(d)(2), Income Tax Regs.  C did not continue P's historic business or use a significant portion of P's historic business assets in a business. Therefore, C did not satisfy the continuity of business enterprise requirement for a tax-free reorganization. As a result, H must recognize gain equal to excess of the fair market value of the property that he received for his P stock over his basis in his P stock.

Frederick Brook Voght and Shane T. Hamilton, for petitioners.

Ross A. Rowley and Steven M. Webster, for respondent.

RUWE, Judge: Respondent determined a deficiency in Archie L. and Louise B. Honbarrier's Federal income tax for 1993 in the amount of $2,090,149. Respondent determined a deficiency in Colonial Motor Freight Line, Inc.'s (Colonial) Federal income tax for 1993 in the amount of $27,374.

The sole issue for decision is whether the merger of Colonial into Central Transport, Inc. (Central), on December 31, 1993, qualifies as a tax-free reorganization within the meaning of section 368(a)(1)(A).[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference. Mr. and Mrs. Honbarrier resided in High Point, North Carolina, at the time they filed their petition. At the time Central filed its petition as successor to Colonial, its principal place of business was High Point, North Carolina.

Colonial

Colonial was incorporated in 1941. Colonial was a trucking company that operated as a common carrier of packaged freight. The company principally transported furniture manufactured in

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code and income tax regulations in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

North Carolina.  Colonial hauled freight in conventional van trailers pulled by highway tractors.

Colonial held an operating authority granted by the Interstate Commerce Commission (ICC) and an operating authority granted by the State of North Carolina.  These authorities granted Colonial contract and common carrier status between specified points and places within the United States and North Carolina for the transportation of packaged freight.

When the trucking industry was deregulated at the Federal level in the 1980's, Colonial was subjected to competition from small individual truckers, with low overhead costs.  As a result, Colonial's ICC operating authority became worthless, and the company experienced significant business reversals.

Colonial operated at a loss in the late 1980's.  On its Federal income tax returns[2] for 1987 and 1988, Colonial reported ordinary losses from trade or business activities as follows:

| Year | Loss |
|------|------|
| 1987 | $1,291,408 |
| 1988 | 2,245,186 |
| Total | 3,536,594 |

In 1988, as a result of its financial losses, Colonial stopped hauling freight and began selling its operating assets.  By December 31, 1990, Colonial had sold all of its operating

---

[2]Colonial elected S corporation status in 1985.  At the end of 1992, Colonial's S corporation status was terminated pursuant to sec. 1362(d)(3).  Colonial was a C corporation in 1993.

assets, except for the ICC and North Carolina operating authorities, for cash and cash equivalents. On August 21, 1992, Colonial sold its North Carolina authority for $5,000 but retained its ICC authority.

Colonial invested the proceeds from the sale of its operating assets almost exclusively in tax-exempt bonds and a municipal bond fund. Colonial held 18 tax-exempt bonds, 16 of which were purchased in 1990 and 1991, and 2 of which were purchased in 1992. One bond was redeemed in 1991, and three bonds were redeemed in 1992 and 1993. Colonial continued to hold the remaining 14 bonds as of the end of 1993.

As of October 31, 1993, 2 months prior to the merger, Colonial held approximately $7.35 million in tax-exempt bonds and a municipal bond fund and approximately $1,500 in cash. On December 31, 1993, Colonial liquidated one of its tax-exempt bonds and its municipal bond fund. The proceeds of this liquidation together totaled more than $2,550,000. As a result, Colonial's cash position increased significantly.

Immediately prior to the merger of Colonial into Central on December 31, 1993,[3] Colonial's assets and liabilities consisted of the following:

---

[3]The merger agreement provided that the merger would occur 1 second before midnight on Dec. 31, 1993.

| Assets | Tax Basis | Fair Market Value |
|---|---|---|
| Cash | $2,413,839 | $2,413,839 |
| Tax-exempt bonds | 4,549,146 | 4,549,146 |
| Interest and dividends receivable | 37,800 | 37,800 |
| ICC authority | [1]-0- | [2]-0- |
| Alex Brown and Sons Account | | |
| Cash | 1,482 | 1,482 |
| Money funds | 18,926 | 18,926 |
| Tax-exempt bonds | 300,000 | 300,000 |
| Total | 7,321,193 | 7,321,193 |
| | | |
| Liabilities | | |
| Federal and State income tax payable | | (76,142) |
| Total | | 7,245,051 |

[1] The ICC authority had no book value or tax basis.
[2] Due to Federal deregulation of the trucking industry in the 1980's, Colonial's ICC operating authority became worthless.

The only expenses incurred by Colonial in 1993, other than Federal and State income taxes and the State intangible tax, were professional fees of $900 and office supplies of $8,733.

From 1985 to December 31, 1993, Mr. Honbarrier owned 100 percent of Colonial's issued and outstanding shares. From 1988 through 1993, Mr. Honbarrier was the sole director of Colonial. On December 31, 1993, Mr. Honbarrier's Colonial stock (245 shares) had a tax basis of $291,506.

Central

Central was incorporated under the laws of North Carolina in 1951. From 1951 through 1997, Central was a trucking company

that operated as a bulk carrier of liquid and dry chemicals.[4] Some of the chemicals that Central hauled were toxic. Central transported bulk chemicals in tanker trailers pulled by tractors.

Central held operating authorities issued by the ICC, various States, and Canada. These authorities granted Central contract and common carrier status for the transportation of bulk chemicals, including liquid or dry toxic chemicals, in tanker trailers between points and places within the United States, various States, and Canada. Central faced minimal competition because of the expensive equipment required to engage in the tanker trucking business.

Central was an S corporation.[5] Central was highly successful in its bulk chemical hauling business, realizing net ordinary income from 1991 through 1996 as follows:

| Year | Amount |
|------|--------|
| 1991 | $2,399,057 |
| 1992 | 2,321,825 |
| 1993 | 3,242,161 |
| 1994 | 8,239,741 |
| 1995 | 7,043,522 |
| 1996 | 6,046,232 |
| Total | 29,292,538 |

---

[4]Central sold substantially all its operating assets and the right to operate under the name of Central Transport, Inc., in 1997. After the sale, Central ceased its motor carrier operations and changed its name to Honbarrier, Inc.

[5]An S corporation generally pays no income tax. Rather, the corporate income is taxed to the shareholders on a pro rata basis. See sec. 1366.

The yearend balances in Central's accumulated adjustments account[6] reported on Central's Federal income tax returns for the years 1991 through 1996 show undistributed earnings as follows:

| Year | Account Balance |
|------|-----------------|
| 1991 | $8,378,797 |
| 1992 | 9,893,868 |
| 1993 | 10,693,387 |
| 1994 | 7,333,838 |
| 1995 | 6,449,973 |
| 1996 | 6,592,738 |

On several occasions, Charles L. Odom, a certified public accountant and Mr. Honbarrier's tax and financial adviser, recommended that Central make distributions to shareholders if such funds were not needed in Central's business. In a memorandum to attorney Charles Lynch, dated November 5, 1993, Mr. Odom stated: "Central has $10 million in undistributed S Corp earnings and would like [to] make a significant distribution to shareholders, but needs its capital for expansion and replacement of aging equipment."

Unlike Colonial, Central did not invest in tax-exempt bonds. Central held passive investments in the form of short-term liquid investments, such as certificates of deposit, because it needed cash and cash equivalents to operate its business. As of yearend 1991 through yearend 1996, Central held cash and short-term investments in the following amounts:

---

[6]The accumulated adjustments account reflects undistributed earnings of Central on which Central's shareholders had paid tax. See sec. 1368.

| Yearend | Amount |
|---------|--------|
| 1991 | $5,621,829 |
| 1992 | 5,688,948 |
| 1993 | 11,924,102 |
| 1994 | 10,658,199 |
| 1995 | 9,363,012 |
| 1996 | 11,999,759 |

For its taxable years 1991 through 1996, Central declared distributions to its shareholders as follows:

| Year | Amount |
|------|--------|
| 1991 | -0- |
| 1992 | $1,000,000 |
| 1993 | 7,000,000 |
| 1994 | 7,540,000 |
| 1995 | 8,333,838 |
| 1996 | 6,449,974 |
| Total | 30,323,812 |

Both Central and Colonial had a long history of operating debt free, in accordance with Mr. Honbarrier's conservative business policy of avoiding debt. Central never incurred either long-term or short-term debt.

Central pursued a 5-year capital expansion program for updating equipment. From 1993 through 1996, Central made expenditures on property and equipment as follows:

| Year | Expenditure |
|------|-------------|
| 1993 | $8,481,534 |
| 1994 | 5,764,211 |
| 1995 | 6,600,730 |
| 1996 | 4,806,384 |
| Total | 25,652,859 |

The majority of these expenditures were for power units (i.e., tractors) and stainless steel tankers. These expenditures were made on a debt-free basis from Central's available funds.

From 1982 through 1997, all of Central's stock was owned by Mr. and Mrs. Honbarrier and their children, Gary L. Honbarrier and Linda Embler.  During the same period, Central had only four directors, consisting of Mr. and Mrs. Honbarrier and their two children.

## Merger of Colonial into Central

On December 31, 1993, Colonial merged into Central in accordance with the laws of North Carolina.  Central was the surviving corporation.  Prior to the merger, Mr. Odom requested that Mr. Lynch research the income tax implications of a merger. On November 5, 1993, 7 weeks before the merger, Mr. Odom made the following handwritten notes:

> ALH Oks merger of Col. & Central, payout to Cen. shareholders
>
> - if tax free
> - need bus. purpose

On November 11, 1993, after researching the matter, Mr. Lynch sent Mr. Odom a memorandum identifying the following possible business reasons for the merger:  (1) Obtaining Colonial's ICC operating rights to expand Central's business; (2) reducing and simplifying operating procedures and expenses by utilizing Central's existing staff and facilities; (3) reducing administrative expenses due to projected increased revenue without increasing overhead expenses; and (4) use of Colonial's

cash to permit Central to expand and capitalize on the operating rights acquired from Colonial.

In a letter dated November 12, 1993, Mr. Odom forwarded a copy of Mr. Lynch's memorandum to Mr. Honbarrier and stated the following:

> Since Colonial has no intention of returning to the transportation industry, its intangible assets (ICC Authority), which would be lost on liquidation, could benefit another company within that industry. It seems to me that a merger could benefit both Central and Colonial. Central would be acquiring valuable rights for current and future use, as well as a substantial addition to its working capital. Colonial would no longer be required to maintain records and manage its investments, file separate income tax returns and whatever other administrative duties are now required.

On November 16, 1993, Mr. Honbarrier telephoned Mr. Odom to tell him to proceed with the merger. Mr. Honbarrier's approval of the merger was forwarded to Mr. Lynch by Mr. Odom on the same day.

On December 22, 1993, Colonial and Central entered into an Agreement and Plan of Merger of Colonial with and into Central (Merger Agreement) providing for a merger of Colonial into Central to occur 1 second before midnight on December 31, 1993. On December 22, 1993, the shareholders and directors of Central unanimously approved the merger. The directors and shareholders' written consent provided, in part, as follows:

> WHEREAS, Colonial Motor Freight Line, Incorporated, has certain Interstate Commerce Commission operating authorities which the Corporation wishes to acquire for current and future use as well as Colonial's

substantial working capital in order to permit it to
make use of Colonial's ICC authority;

As previously stated, Colonial's ICC operating authority had no value, and Central never used the ICC operating authority acquired from Colonial in the merger. Central never operated as a packaged-freight carrier.

For purposes of the merger, Mr. Odom determined that the premerger value of Central's stock was $417.45 per share. He then determined that the net asset value of Colonial, which was being acquired by Central, was $7,442,660[7] and that the number of Central shares necessary to compensate Mr. Honbarrier for his Colonial stock was 17,840 shares. Pursuant to the merger, Mr. Honbarrier's 245 shares of Colonial stock were exchanged for 17,840 shares of Central stock. The merger changed Central's shareholder ownership as follows:

|  | Before Merger: | | After Merger: | |
|---|---|---|---|---|
|  | Shares | Percent Ownership | Shares | Percent Ownership |
| Mr. Honbarrier | 65,484 | 72.0396 | 83,324 | 76.6268 |
| Mrs. Honbarrier | 300 | 0.3300 | 300 | 0.2760 |
| Gary L. Honbarrier | 12,558 | 13.8152 | 12,558 | 11.5486 |
| Linda Embler | 12,558 | 13.8152 | 12,558 | 11.5486 |
| Total | 90,900 | 100.0000 | 108,740 | 100.0000 |

On December 22, 1993, the board of directors of Central also declared a $7 million distribution payable to its shareholders on December 31, 1993. The shareholder distribution was allocated on a pro rata basis among the shareholders based on their stock

---

[7]This figure includes $175,000 for Colonial's ICC operating authority. As we previously found, the ICC operating authority had no value and should not have been included in Colonial's net asset value.

ownership in Central on December 22, 1993.  The amounts to be distributed to the various shareholders were as follows:

| Shareholder | Allocable Amount of Distribution |
|---|---|
| Mr. Honbarrier | $5,042,772 |
| Mrs. Honbarrier | 23,102 |
| Gary L. Honbarrier | 967,063 |
| Linda Embler | 967,063 |
| Total | 7,000,000 |

With the exception of the amount allocable to Mr. Honbarrier, all of the declared distributions were paid by check on December 31, 1993.  Central made the $5,042,772 distribution to Mr. Honbarrier in two parts.  The first part was paid via a $493,626 check drawn on Central's account on December 31, 1993. Thus, the cash distributions made to Mr. Honbarrier and the other shareholders on December 31, 1993, totaled $2,450,854.[8]  The second part of the distribution to Mr. Honbarrier was made on January 3, 1994, and consisted of $4,549,146 in tax-exempt bonds.[9]  The tax-exempt bonds distributed to Mr. Honbarrier on January 3, 1994, were the same bonds acquired by Central from Colonial in the merger.

For Federal income tax purposes, petitioners treated the merger as a tax-free reorganization within the meaning of section 368(a)(1)(A) and treated the $7 million distribution as a

[8]The cash and cash equivalents that Central received from Colonial on Dec. 31, 1993, totaled $2,472,047.

[9]The parties have stipulated that Mr. Honbarrier was in actual or constructive receipt of his entire $5,042,772 share of the distribution at the close of 1993.

payment of previously taxed income reflected in Central's accumulated adjustments account.

## OPINION

As a general rule, any gain recognized on the sale or exchange of property is taxable. However, the Internal Revenue Code provides that certain transactions may occur in such a way that ownership interests are exchanged, yet no taxable event is deemed to have taken place. One instance where nonrecognition is provided involves corporate reorganizations that come within the provisions of section 368. The income tax regulations explain the rationale behind the reorganization provisions as follows:

> Under the general rule, upon the exchange of property, gain or loss must be accounted for if the new property differs in a material particular, either in kind or in extent, from the old property. The purpose of the reorganization provisions of the Code is to except from the general rule certain specifically described exchanges incident to such readjustments of corporate structures made in one of the particular ways specified in the Code, as are required by business exigencies and which effect only a readjustment of continuing interest in property under modified corporate forms. Requisite to a reorganization under the Code are a continuity of the business enterprise under the modified corporate form, and (except as provided in section 368(a)(1)(D)) a continuity of interest therein on the part of those persons who, directly or indirectly, were the owners of the enterprise prior to the reorganization. * * * [Sec. 1.368-1(b), Income Tax Regs.]

Shareholders generally do not recognize gain or loss when stock in a corporation that is a party to a reorganization is, pursuant to a plan of reorganization, exchanged solely for stock in another corporation that is a party to the reorganization.

See sec. 354(a)(1).  Section 368(a)(1)(A) defines a reorganization as "a statutory merger or consolidation".  A statutory merger or consolidation is one effected pursuant to the corporate laws of the United States, a State, a territory, or the District of Columbia.  See sec. 1.368-2(b)(1), Income Tax Regs. The merger of Colonial into Central meets this literal requirement.  Petitioners argue that they are entitled to tax-free treatment under the Code because the merger was a complete and valid transaction for State law purposes.

It has long been held that qualification as a merger under State law is not, by itself, sufficient to qualify as a reorganization under section 368(a)(1)(A).  Courts have interpreted section 368 as imposing three additional requirements for a merger to be treated as a reorganization under section 368(a)(1)(A).  These are: (1) Business purpose; (2)continuity of business enterprise; and (3) continuity of interest.  See Gregory v. Helvering, 293 U.S. 465 (1935); Wortham Mach. Co. v. United States, 521 F.2d 160 (10th Cir. 1975); Cortland Specialty Co. v. Commissioner, 60 F.2d 937 (2d Cir. 1932); Atlas Tool Co. v. Commissioner, 70 T.C. 86, 100 (1978), affd. 614 F.2d 860 (3d Cir. 1980).  Following judicial precedent, the regulations also require that there be a business purpose for the transaction, continuity of business enterprise, and continuity of interest, in order for a merger to qualify as a reorganization under section

368(a)(1)(A). See sec. 1.368-1(b), Income Tax Regs.; T.D. 7745, 1981-1 C.B. 134. Failure to comply with any one of these requirements will preclude treatment as a tax-free reorganization within the meaning of section 368(a)(1)(A).

Respondent argues that the merger failed to meet the continuity of business enterprise requirement necessary to qualify the merger as a tax-free reorganization within the meaning of section 368(a)(1)(A).[10] The continuity of business enterprise requirement was first expressed in <u>Cortland Specialty Co. v. Commissioner</u>, <u>supra</u>. See <u>Laure v. Commissioner</u>, 653 F.2d 253, 258 (6th Cir. 1981). This requirement is now embodied in section 1.368-1(b), Income Tax Regs., and described in paragraph (d) of the same section. These regulations are based on an interpretation of judicial precedents which articulate the continuity of business enterprise doctrine. See T.D. 7745, 1981-1 C.B. 134. The basic concept behind the continuity of business enterprise requirement is that the receipt of a new ownership interest in an entity that retains none of the business attributes of the shareholder's former corporation is more closely akin to a sale or liquidation than to a mere adjustment in the form of ownership. See <u>Laure v. Commissioner</u>, <u>supra</u> at 258.

---

[10]Respondent also argues that the merger did not have any business purpose. Because we hold that the merger did not satisfy the continuity of business enterprise requirement, we need not address respondent's alternative argument.

Under the income tax regulations, a transaction constitutes a tax-free reorganization only if there is "a continuity of the business enterprise under the modified corporate form".  Sec. 1.368-1(b), Income Tax Regs.  Continuity of business enterprise requires that the acquiring corporation either continue the acquired corporation's historic business or use a significant portion of the acquired corporation's historic business assets in a business.  See sec. 1.368-1(d)(2), Income Tax Regs.  In essence, the acquiring corporation must retain a link to the business enterprise of the acquired corporation by continuing the acquired corporation's business or by using the acquired corporation's business assets in a business.  See Berry Petroleum Co. v. Commissioner, 104 T.C. 584, 635-636 (1995), affd. 142 F.3d 442 (9th Cir. 1998).  In this case, as explained below, we find that Central neither continued Colonial's historic business nor used a significant portion of Colonial's historic business assets in Central's business operations.

1.  Continuation of Acquired Corporation's Historic Business

In general, a corporation's historic business is the business it has conducted most recently.  See sec. 1.368-1(d)(3)(iii), Income Tax Regs.  Petitioners contend that there is a continuity of Colonial's trucking business because Central is also in the trucking business.  We disagree.

Colonial terminated its business of hauling packaged freight in 1988.[11]  It then began selling its operating assets.  From 1988 forward, Colonial had no customers.  By the end of 1990, Colonial had essentially disposed of its trucking operation assets for cash and cash equivalents.  The only trucking assets Colonial retained were its ICC and North Carolina operating authorities.  The ICC operating authority had become worthless, and Colonial sold its North Carolina operating authority in 1992 for $5,000.  For 3 years prior to the merger, Colonial's assets consisted principally of tax-exempt bonds and a municipal bond fund.[12]  During the 3-year period prior to the merger, Colonial held 18 tax-exempt bonds, 16 of which were purchased in 1990 and 1991, and 2 of which were purchased in 1992.  One bond was redeemed in 1991, and three bonds were redeemed in 1992 and 1993.  Colonial continued to hold the remaining 14 bonds as of the end of 1993.

Colonial stopped hauling freight approximately 5 years prior to the merger, had essentially sold all of its operating assets 3 years prior to the merger, and for 3 years prior to the merger kept most of its assets in tax-exempt bonds and a municipal bond

---

[11]Colonial principally transported furniture manufactured in North Carolina.

[12]The passive income from these money management activities caused Colonial to lose its S corporation status at the end of its 1992 tax year pursuant to sec. 1362(d)(3).  For the taxable year 1993, Colonial was a C corporation and Central was an S corporation.

fund.  We conclude that Colonial had abandoned its trucking business well before the merger.[13]  Colonial's most recent business type activity was acquiring and holding tax-exempt bonds and a municipal bond fund.  This was Colonial's historic business at the time of the merger for purposes of determining whether there was a continuity of business enterprise.  See, e.g., Abegg v. Commissioner, 50 T.C. 145 (1968), affd. 429 F.2d 1209 (2d Cir. 1970).[14]

As of October 31, 1993, 2 months prior to the merger, Colonial held approximately $7.35 million in tax-exempt bonds and a municipal bond fund and approximately $1,500 in cash.  On December 31, 1993, Colonial liquidated one of those bonds and its municipal bond fund for more than $2,550,000.  As a result, Colonial's cash position increased significantly.

The fair market value of the tax-exempt bonds held directly

---

[13]We also note:  (1) The type of trucking business conducted by Central involving hauling solid and liquid (and sometimes toxic) chemicals in expensive tanker trailers was different from the operations previously conducted by Colonial; (2) Central never operated as a packaged-freight carrier; and (3) Central never used the ICC operating authority acquired from Colonial in the merger.

[14]We recognize that investment activity is not a trade or business for some purposes.  See Commissioner v. Groetzinger, 480 U.S. 23 (1987).  However, investment activity has been recognized as a historic business for purposes of the continuity of business enterprise doctrine.  See Abegg v. Commissioner, 50 T.C. 145 (1968), affd. 429 F.2d 1209 (2d Cir. 1970); see also T.D. 7745, 1981-1 C.B. 134, 139 (Investment operations may constitute a historic business if the investment assets were not acquired as part of a plan of reorganization).

by Colonial totaled $4,549,146 just before the merger on December 31, 1993. Three days after the merger, Central distributed these same tax-exempt bonds to Mr. Honbarrier.[15] This distribution occurred on January 3, 1994.[16] The last tax-exempt bond acquired by Central in the merger was worth $300,000 and held in the Alex Brown and Sons account. This bond was liquidated by Central 4 months after the merger. Unlike Colonial, Central did not invest in tax-exempt bonds. Central placed its money in short-term liquid investments, such as certificates of deposit because it needed cash and cash equivalents to operate its business. Thus, we conclude that Central did not continue Colonial's business of holding tax-exempt bonds and municipal bond funds.

2. <u>Significant Use of Acquired Corporation's Business Assets</u>

Continuity of business enterprise can also be satisfied if the acquiring corporation uses a significant portion of the acquired corporation's historic business assets in a business. See sec. 1.368-1(d)(4)(i), Income Tax Regs. A corporation's historic business assets are the assets used in its historic

---

[15]On Dec. 31, 1993, the date of the merger, Central made $2,450,854 in cash distributions to Mr. Honbarrier and other shareholders of Central.

[16]The merger was effective on Dec. 31, 1993, at 1 second before midnight. Dec. 31, 1993, fell on a Friday, and the tax-exempt bonds totaling $4,549,146 were distributed to Mr. Honbarrier on Jan. 3, 1994, which fell on a Monday. Mr. Honbarrier testified that the bonds could not be signed over to him until the bank opened on Monday, Jan. 3, 1994, even though the merger was effective on Friday, Dec. 31, 1993.

business.  See sec. 1.368-1(d)(4)(ii), Income Tax Regs.  Business

assets may include stock and securities.  See id.  In general,

the determination of the portion of the corporation's assets

considered "significant" is based on the relative importance of

the assets to the operation of the business.  See sec. 1.368-

1(d)(4)(iii), Income Tax Regs.  However, all other facts and

circumstances, such as the net fair market value of those assets,

will be considered.  See id.

Colonial's historic business assets were its tax-exempt

bonds and municipal bond fund.  It was never intended that

Colonial's tax-exempt bonds and municipal bond fund be held by

Central and, after the merger, Central did not use those assets

in its business.  On the day of the merger, Colonial liquidated a

tax-exempt bond and its municipal bond fund for more than $2.5

million in cash.  On the same day, Central made a cash

distribution to Central's shareholders in the total amount of

$2,450,854.[17]  Three days after the merger, tax-exempt bonds

totaling $4,549,146 that had been held by Colonial were

_____

[17]Both the merger and distribution were authorized on Dec.
22, 1993, and both transactions occurred on Dec. 31, 1993.  We
are not convinced that Central would have made a $7 million
dividend absent the merger with Colonial in light of Central's
needs for expansion and replacement of aging equipment and
Central's practice of not borrowing money.  Indeed, Central's
yearend balances in its accumulated adjustments account (the
undistributed earnings on which tax has been paid by Central's
shareholders) for 1991 and 1992 were $8,378,797 and $9,893,868,
respectively.  Yet, Central made no distributions to shareholders
in 1991 and distributed only $1 million in 1992.

distributed to Mr. Honbarrier.[18]  The remaining tax-exempt bond, valued at $300,000, which was held in an account with Alex Brown and Sons, was liquidated 4 months later.

As a result of the transactions surrounding the merger, all of Colonial's investments in tax-exempt bonds and the municipal bond fund were disposed of and Colonial ceased to exist.  We find that Central did not use a significant portion of Colonial's historic business assets in a business.

3.  Conclusion

Central did not continue either Colonial's historic business or use a significant portion of Colonial's historic business assets in a business.  As a result, Central did not satisfy the continuity of business enterprise requirement.  See sec. 1.368-1(b), Income Tax Regs.

We hold that the merger of Colonial into Central was not a tax-free reorganization within the meaning of section 368(a)(1)(A).  Because this merger did not qualify as a reorganization under section 368(a)(1)(A), Mr. Honbarrier's exchange of Colonial stock for valuable consideration was a taxable event.  Colonial's assets had a net fair market value of

---

[18]The merger was not effective until 1 second before midnight on Dec. 31, 1993.  As a result, ownership in Colonial's assets could not pass to Central until then.  However, on Dec. 27, 1993, Central instructed the financial institutions holding Colonial's bonds valued at $4,549,146 that those bonds were to be transferred to Mr. Honbarrier effective Jan. 3, 1994.  On Jan. 3, 1994, they were transferred to Mr. Honbarrier.

$7,245,051[19] at the time Colonial was merged into Central.

Petitioners acknowledge that Mr. Honbarrier received full fair

market value for his stock in Colonial.[20]  Mr. Honbarrier must

therefore recognize capital gain of $6,953,545, which is equal to

the excess of the fair market value of assets he received for his

Colonial stock ($7,245,051) over his basis ($291,506).[21]

In the notice of deficiency to Colonial, respondent

determined that Colonial had a gain on the sale or exchange of

its assets in the merger transaction.  However, respondent now

agrees that Colonial did not realize any gain because the fair

market value of its assets equaled its tax basis in those assets.

> Decision will be entered under
>
> Rule 155 in docket No. 9053-97.
>
> Decision will be entered for
>
> petitioner in docket No. 9054-97.

---

[19]$7,321,193 - $76,142 (tax liability) = $7,245,051

[20]Mr. Honbarrier was provided with 17,840 shares of Central stock, which petitioners determined had a value equal to the net asset value of Colonial.  In their brief, petitioners state:  "At the time of the merger, Mr. Honbarrier's 245 shares of Colonial stock were converted into 17,840 shares of Central stock, which were equivalent in value to his Colonial shares."

[21]On brief, respondent proposes several substance-over-form arguments.  In light of our conclusion that the statutory merger of Colonial into Central fails the continuity of business enterprise requirement under sec. 1.368-1(b), Income Tax Regs., and therefore does not qualify as a tax-free reorganization within the meaning of sec. 368(a)(1)(A), we need not decide or address respondent's various substance-over-form scenarios.